CITY OF ST. LOUIS v. A. H. HANDLAN et al.; A. H. HANDLAN, HECTOR A. PIEDNOIR, Jr., PAUL BAKEWELL, BUCKINGHAM HOTEL COMPANY and SIMON VAN RAALTE, Appellants.

Division One, March 29, 1912.

1. BUILDING LINE: Straight or Boundary Line: Meaning of Article A.  The city charter, by authorizing the municipal assembly to establish "a building line," did not, by the use of the article *a*, mean a straight line, but simply meant that it should establish a limit or boundary line.  It would be a strained, illogical and narrow construction to give to the article *a* a fixed and unalterable meaning.  The words "a building line" mean at least two lines, one on each side of the boulevard.

2. ———: ———: Irregular Line: Valid Ordinance.  Boulevards, either by the historical origin and development of the word, or by the present general method of their construction, are not confined by straight lines, and there is no inherent reason why their boundaries should be so confined.  The charter in authorizing the municipal assembly by ordinance to establish "a boundary line" to a boulevard, meant that houses in certain blocks may be constructed within certain distances of the boulevard line and at different distances in other blocks.

3. BOULEVARD: Building Line Restrictions: Exemptions of Certain Properties: Invalid Ordinances.  In the face of a charter provision authorizing the city to "establish a building line to which all buildings, fences and other structures thereon shall conform," an ordinance exempting certain abutting properties from building line restrictions and authorizing the owners to build regardless of the line established, and requiring all houses or other buildings hereafter constructed on other lots to be located within the building lines, with no reason given or attempted for such classification of properties, is invalid. That is a capricious, arbitrary and irregular exercise of the lawmaking power confided to the municipal assembly.  It is a classification

that is not lawmaking in the sense of making one rule for all within the scope of the law. It lays the burden upon some property holders and exempts it from others.

Appeal from St. Louis City Circuit Court.—*Hon. Robert M. Foster* and *Hon. George H. Williams,* Judges.

REVERSED.

*Hornsby, Collins & Chappelle* for appellants.

Ordinances numbered 20729 and 21162 are void in that they are not in conformity with the city charter, and the final judgment founded on said ordinances is also void for the reasons that: (1) Said ordinances attempt to establish several building lines in West Pine boulevard, although the charter, section 1, article 6, authorizes but one such building line. (2) Said ordinances attempt to exempt certain parcels of ground fronting on said street from the restrictions of said ordinances, although the city charter authorizes no such exemptions.

*Lambert E. Walther, Elmer E. Pearcy, C. W. Bates* and *C. P. Williams* for respondent.

(1) The amended petition did not state a new cause of action because of the exemption of an additional seventy-three feet of the property of the Buckingham Hotel Company from the building line. Railroad v. Reinhardt, 14 Ind. App. 588; Railroad v. Jones, 103 Ind. 386; Railroad v. Clark, 121 Mo. 200; Windham v. Litchfield, 22 Conn. 226; Martin v. Railroad, 220 Ill. 97; Syracuse v. Stacey, 86 Hun, 441; Darrow v. Railroad, 169 Ind. 104; McClarren v. School, 169 Ind. 140; Robinson v. Railroad, 174 Pa. St. 199; Railroad v. Water Co., 10 Ky. 175. Each separate owner of property is to be considered separately in a suit of this character. He is independent of the other

owners of property taken as to the question of damages and benefits to his property, and cannot complain of injuries affecting other defendants in the case, which have no application to his own. Kansas City v. Smart, 128 Mo. 293; City v. Lanigan, 97 Mo. 180. If such exemption did constitute a change in the cause of action, the only party that could complain would be the owner of the property exempted, that is, the Buckingham Hotel Company, and it has waived its right to object on this ground by entering its voluntary appearance as a defendant in this case, filing exceptions to the commissioners' report, and going to trial upon the merits. St. Louis v. Gleason, 89 Mo. 72; Grymes v. Mill Co., 111 Mo. App. 361; Walker v. Railroad, 193 Mo. 453; Railroad v. Donovan, 149 Mo. 101. (2) The charter does not contemplate that in the establishment of a building line along a boulevard, such line must be at a uniform distance from the roadway. Such an interpretation of the charter would make it practically impossible for the city to ever change a street upon which improvements have already been made, into a boulevard. The result and consequence of any particular interpretation may properly be considered as a guide to the probable intent of the language. State ex rel. v. Slover, 126 Mo. 661. The intent of the framers of the charter amendments, as gathered from the instrument itself, when applied to the facts of this case, clearly negatives the idea that the building line on either side of the roadway must be at a uniform distance therefrom. Art. 6, sec. 1, Charter of St. Louis; St. Louis v. Hill, 116 Mo. 527.

LAMM, J.—In June, 1902, an ordinance went into effect in St. Louis entitled, "An ordinance to *establish* West Pine boulevard as a boulevard," there being at that time an east-and-west street in that city known as "West Pine boulevard" running from Grand avenue to Kingshighway. The ordinance object was to

make a real boulevard out of a real street then desig-
nated (on paper only) as a boulevard.

Counting on that ordinance, condemnation pro-
ceedings were commenced by the city in January, 1903,
in the St. Louis Circuit Court, whereby damages and
benefits were to be assessed and collected and the
boulevard established by the exercise of the right of
eminent domain. After certain steps in that case the
city in July, 1903, passed another ordinance purport-
ing to amend the first one by striking out the old and
inserting a new title, viz.: "An ordinance to *change*
the street now designated as West Pine boulevard into
a boulevard." Other changes were made to make it
conform to the new title, and yet another whereby cer-
tain property exemptions in the old ordinance were
enlarged by the new.

Afterwards in April, 1904, the city filed an amend-
ed petition setting up both the old and the new ordi-
nances and counting on both. Thereafter such steps
were taken as resulted in the appointment of commis-
sioners to assess benefits and damages, followed by a
report of those commissioners, exceptions to that re-
port on the part of certain property owners, a ruling
on those exceptions, whereby the report was amended,
and (as amended) approved, and finally a judgment
in favor of the city. From that judgment certain
interested property owners appeal.

In this court on motion of the Thrift Realty Com-
pany it was substituted for appellant Hector A.
Piednoir, for the reason that since the appeal it ac-
quired by purchase the land then owned by Piednoir
and affected by the judgment.

One question, a primary one, is, should the judg-
ment be 'reversed because there are several building
lines established by the ordinances, whereas (it is
argued) under the charter, there could be but one on a
boulevard? Again, both ordinances exempt certain
fronting lots and parcels of ground from ordinance

restrictions, whereas (it is argued) the charter author-
izes no such exemptions. On one or both of said
grounds are the ordinances void and the judgment er-
roneous?

There are other interesting questions here. In
all there are six main and several subsidiary proposi-
tions discussed in briefs, all of them, except the fore-
going, relating to alleged errors in procedure. It is
manifest, however, that if the ordinances on which
the suit is grounded are void as contended, then mere
questions made on this, that, or the other phase of the
proceedings are not regularly reached and should be
reserved until, becoming vital in some other case,
they call for judicial determination. Accordingly to
that primary question, lying at the door-way, we ad-
dress ourselves.

The determination of that question seeks cer-
tain provisions of the charter and of the two ordi-
nances assailed.

The material charter provisions are:

"The Municipal Assembly may, by ordinance
recommended by the board of public improvements,
establish and open boulevards, or change existing
streets into boulevards, and fix the width thereof, and
the manner of laying out and improving the same;
and may regulate the traffic thereon, and may exclude
heavy driving thereon or any kind of vehicle there-
from, and may exclude and prohibit the erection or
establishment or maintenance of any business house,
or the carrying on of any business vocation on the
property fronting on such boulevard, and may estab-
lish a building line to which all buildings, fences, or
other structures thereon shall conform. And may pro-
vide for grading," etc.

Turning to the two ordinances held in judgment,
they outline, as said, a scheme for changing that part
of Pine between Grand and Kingshighway into a boul-
evard. By some provisions they forbid heavy hauling;

the use of heavy vehicles and those not having springs, the driving of herds of cattle and droves of horses, sheep and hogs thereon, etc. By still another the erection, establishing or maintaining upon the property fronting on said boulevard, "where said building line has been established," of any business house, is forbidden. By still another provision is made for beautifying the boulevard with shrubbery, etc.

Coming closer to the point the ordinances lay down eight different building lines. On the north of the boulevard these lines vary from thirty-five to forty-five feet distant from the north line of the boulevard, to-wit: Thirty-five feet between Grand and Sarah, forty feet between Sarah and Boyle, and forty-five feet between Boyle and Kingshighway. On the south they vary from thirty to forty-five feet, to-wit: thirty-five feet between Grand and Spring, thirty feet between Spring and Vandeventer, thirty-five feet between Vandeventer and Boyle, forty feet between Boyle and Newstead, and forty-five feet between Newstead and Kingshighway.

The ordinances further provide that of the abutting property on the proposed boulevard four parcels, aggregating 930 feet and four inches, are exempted by specific descriptions from building line restrictions. These exemptions cover the property of four named owners. Further that (quoting) "all houses or buildings thereafter to be erected on said West Pine boulevard, except as hereinafter provided for, shall be located within the building lines;" and then goes on to say that "the establishment of this building line shall not compel the removal of the structures which now exist upon the lots and extend beyond said line, and the same may remain advanced beyond said line to the extent now existing at the option of the present owners thereof, their heirs, executors, administrators, or assigns."

The foregoing is enough of the record to decide the proposition now up.

(a)   Do the zigzag contour lines of the proposed boulevard invalidate the ordinances?

(1)   It is argued that the charter authorizes an ordinance establishing "*a* building line." That the meaning of that phrase is one straight line on each side, and stress is put upon the use of the indefinite article "a." It is not worth while to try to conceal (or explain) my indisposition to be drawn into a judicial exposition of the meaning and office of the indefinite article "a." We could hardly come by the true and broad intendment of the charter by such a discussion, however refined, accurate and learned. In jurisprudence, as in the other affairs of mankind, a mountain should not be made out of a mole hill. Those judges who strain at gnats are in the same category of those who swallows camels (Matt. xxiii. 24.) It is likely the lawmaker cunningly hid away the meaning of his law in a word of not only one syllable but of one letter— a meaning to be got at by boring with a gimlet of grammatical construction? That would be to try to stand a cone on its apex. It would be *multum in parvo* with a vengeance, indicating a legislative power of condensation hitherto undreamed of.     Appellants' counsel concedes that *two lines* are meant by the charter language and this although the word "line" is used in the singular number. That concession is due to the very reason of the thing, since there are two sides to every boulevard and therefore two building lines both of which must be within the purview of the law. Reason therefore teaches us, concedes counsel in effect, that the phrase "a building line" means *two* building lines. Does not the same reason teach us that if the lawmaker had meant two *straight* lines he would have said so? The word "line," in and of itself, may (but does not necessarily) mean a straight line, even in mathematics, and certainly not in everyday speech.

Hogarth's line of beauty was a combination of curves somewhat like cupid's bow. We speak of a boundary line, but we do not mean in all cases a straight line. We speak of a line fence and may mean a Virginia worm fence—a zigzag fence. We speak of a bee line and then we mean a straight one. The subject-matter must be looked to to see whether "line" means a straight line. As used in the charter we think the word means a mark of division or demarkation, an outline or contour, a limit or boundary. [*Vide,* Web.]

Since there is no disputing about tastes (*De gustibus,* etc.) it is not worth while to argue that good taste requires a straight building line in a street reconstructed for travel as well as beauty and pleasure to the eye. Jones may like straight lines; Brown, curves; Smith, broken lines. The legislative mind may prefer a combination of all—a fantastic or rococo style.

(2) Is there anything in the word "boulevard" that necessarily means straight building lines? Let us look into that. It was once a warlike term, and meant the flat top of a bulwark or rampart—the fortified wall roundabout a city. For all I know Belshazzar, the son of grass-eating Nebuchadnezzar, drove his chariots on the walls of Babylon and hurled defiance at his foes. If he did he drove on a *boulevard.* As though beating a sword into a plowshare or a spear into a pruning hook, we are told by scholars that when in the course of time a city's obsolete walls were razed, the space occupied by the foundations was frequently turned into a street or avenue for the use and pleasure of citizens, and that the name *boulevard* was given to such street out of respect to and to connect it with its original use. Thereto all the lexicographers agree (*q. v.*). Gradually its meaning was modified and enlarged until now it means a street constructed with parklike features, a wide street, or a street encircling a town, one with sides or center for shade trees, flow-

ers, seats, etc., and not used for heavy teaming. [Howe v. Lowell, 171 Mass. l. c. 580-1.]  A broad street, promenade or walk planted with rows of trees, a broad avenue ·in or around a city—one specially designed for pleasure walking or driving.    [West Chicago Park Comm'rs v. Farber, 171 Ill. l. c. 160-1.]  ''. . . So the word 'boulevard,' which originally indicated a bulwark or rampart, and was afterwards applied to a public walk or road on the site of a demolished fortification, is now employed in the same sense as public drive.''  [People ex rel. v. Green, 52 How. Pr. l. c. 445.]

It is manifest that the military walls, known as boulevards, were not confined by straight lines and there is no inherent reason why the pleasure drives on the site of such demolished fortifications should be confined by straight lines.  As the idea of a boulevard is borrowed, was not the character of its sides also borrowed from the original?  May we not assume to know as a matter of common knowledge that many a boulevard is of irregular dimensions and sides, sometimes a drive with wide borders which, a little further on, swells into a wide street with irregular sides and parklike proportions and effects?  We think so.

The point is ruled against appellants.

(b)  Do the ordinances violate the charter because of their exemptions?

The provision of that instrument giving to the municipal legislature power to pass ordinances relating to establishing building lines on boulevards runs in these words: ''and may establish ·a building line to which all buildings, fences or other structures thereon shall conform.''  The ordinances in question established a building line and in the same breath exempted certain properties from the established line.  The owners of those exempted properties were authorized to build regardless of the line established and to that extent the ordinances fly in the face of both the language

and intendment of the charter.  No reason is given or attempted for such classification of properties and we know of none that could be given, where the ordi· nances (as here) do not require existing structures to be razed.  No ordinance can make fish of one and fowl of another in the same natural class and be valid. To loose one and bind another abutting property owner is not lawmaking in the sense of making one rule for all within the scope of the law.  It ignores the primal lawmaking idea of equality and uniformity.  It is a mere capricious, arbitrary and irregular exercise of the lawmaking power· confided to the municipal assembly.  The benefits of the ordinances are unequally distributed among the property owners from Grand to Kingshighway, and its burdens are unequally laid on the necks of the same property owners.  Evil would be the fruit if the precedent were established for such transparent favoritism.  If the named exemptions are to be allowed, then why not (as put by appellant's counsel) indefinitely extend them, exempt most of the property owners and thereby buy peace for the scheme?  Or the powerful be loosed and the weak bound?

We think the ordinances violate the charter provision quoted and are void.  It is not necessary to cite authority for the trite doctrine that a void ordinance is equivalent to none at all and that where a court proceeding cannot go on without an ordinance, as here, a valid one is essential to the court's jurisdiction.  Damages and ·benefits must needs be assessed in view of property restrictions affecting the street as a street.  It follows that the mischiefs flowing from the invalidity of these ordinances permeate the judgment rendered.

As the ordinances are invalid other questions are not reached.  The judgment is reversed.  All concur.