In Re PROCEEDING TO RESTRICT USE OF PROPERTY ALONG GLADSTONE BOULEVARD AND TO CONDEMN CERTAIN RIGHTS THEREIN; KANSAS CITY, Appellant, v. FRED LIEBI et al.

In Banc, May 22, 1923.

1. **RESTRICTING USE OF ESTABLISHED STREET**: Resident Purposes: Eminent Domain: Valid Ordinance. The ordinance recited that Gladstone was the first boulevard or parkway established in the city, that all the buildings along its entire length of three miles are used for residential purposes, and that the overwhelming sentiment of the property-owners immediately interested is that the enactment and enforcement of the ordinance would "enhance and stabilize the value and utility of each piece of property within the benefit district herein prescribed and add to the beautification of said highway;" and then enacted that no house or building shall be constructed "within thirty-five feet of the nearest adjacent side line of said boulevard within twenty years, nor shall any house or building within said benefit district be used within that period for any other than residential purposes," and specifically excluded bill boards, gasoline filling stations, and gasoline tanks used in connection with others having a capacity in excess of one hundred gallons. The benefit district was made to comprise all lands lying within one hundred and fifty feet of either side line of the boulevard, and the ordinance provided for a condemnation proceeding to determine the damage any property owner would sustain from an enforcement of the ordinance, which was to be paid

by special assessment upon real property within the benefit district, according to terms prescribed by the city council. Some existing buildings were nearer than thirty-five feet to the boulevard line, but the ordinance did not require them to be moved. The petition asking for the enactment of the ordinance was signed by 107 persons interested in the development of the boulevard, and only five persons owning property abutting on the boulevard appeared to this proceeding in the circuit court and moved to dismiss it, and 46 others by their answers expressed satisfaction with the proceeding and prayed the court to carry it into effect. The boulevard is essentially a residence district, and the value of the abutting property is based on its use for dwellings, and its use for any other purpose would tend to depreciate its value; and the trend of the evidence was that the proposed restricted use of the abutting properties would tend to prevent overcrowded and congested districts, thereby promoting the public health and general welfare of the city, would make the city more attractive and thereby promote its growth, and would afford means of recreation to people who desired to drive or walk along the boulevard in the same way that a public park would. *Held*, that, to so restrict the use of the abutting lots is to devote them to a public use; to employ the power of eminent domain in enforcing such restricted use does not violate any constitutional provision; such restricted use is not the taking of private property for a private use without the owner's consent; and the ordinance is within the charter powers of the city, and the judgment dismissing the proceeding is reversed; WALKER, J., dissenting in a separate opinion, in which DAVID E. BLAIR, J., concurs.

2. ———: **Legislative Acts: Presumptively Valid: Eminent Domain.** The propriety, expediency and necessity of a legislative act are purely for the determination of the legislative authority, and a legal presumption of validity attends a municipal ordinance authorized by statute, and if there is doubt as to its constitutionality it must be held to be constitutional.

3. ———: **Eminent Domain: Public Use: Application.** No satisfactory definition of the term "public use" has ever been achieved by the courts. One theory limits the application of the term to public "employment" or "occupation." A more liberal and flexible meaning of "public use" makes it synonymous with "public advantage," "public benefit." Any definition will exclude some subjects that should be included, and include others that should be excluded. But the term as used in constitutions has a progressive flexibility, adapting its application to the interdependence and the complexity of communities of increasing density of population. And in order to constitute a public use it is not necessary that the whole

community or any large part of it should actually use or be bene-
fited by a contemplated improvement; benefit to a considerable
number is sufficient. Nor does the mere fact that the advantage of
a public improvement also inures to a particular individual or
group of individuals deprive it of its public character.

4. ———: ———: Public Use Applied to Lands: Actual Occupation
by Public. The taking of lands for public use is not limited to
their actual occupation by the public. Any regulation which im-
poses a restriction upon the use of property by the owner, and
any neighboring public improvement which tends to impair the
enjoyment of property by affecting some right or easement appur-
tenant thereto, may be, under certain circumstances, a public use
within the meaning of the Constitution.

Held, by WALKER, J., dissenting, with whom DAVID E. BLAIR,
J., concurs, that a public use implies possession, occupation
and enjoyment by the public at large or by public agencies;
and where private property would remain private property
and the effect of enforcing an ordinance undertaking to con-
demn it would simply be to limit in some instances the right
of enjoyment of the owner's own property for the benefit of
other private individuals, the use is not a "public use" in the
constitutional sense.

5. ———: ———: ———: ———: Building Line: Adornment. An
ordinance which devotes the abutting property on each side of an
established boulevard to residential purposes exclusively and
prescribes a building line thirty-five feet from the street for
buildings thereafter constructed, is not unconstitutional. It is
much like a parkway along a boulevard, which is not taken pos-
session of by the public in the sense that the public occupies it,
but tends to enhance the attractiveness of the street and the value
of the property abutting upon it. Such restrictions are legitimate
exercise of the sovereign power of the State in the interest of
health, safety, morality, general enjoyment and education of the
community.

Held, by WALKER, J., dissenting, with whom DAVID E. BLAIR,
J., concurs, that three things must concur to effectuate a
valid condemnation: (a) The public must obtain possession
of the property attempted to be condemned; (b) the use must
be one of utility, not aesthetic or for pleasure, and (c) com-
pensation must be made, but it will not supply the absence
of possession and public utility. An ordinance attempting
to restrict all property abutting on a boulevard to residential
purposes exclusively and forbidding the construction of a
house within thirty-five feet of the street line under the guise
of the exercise of the power of eminent domain, if enforced,

Kansas City v. Liebi.

would result in the confiscation of private property for purely aesthetic purposes, and the attempted condemnation is therefore invalid.

6. ——: ——: **Unreasonable Ordinance.** Usually an ordinance will not be declared unreasonable in its operation upon the persons affected if it is within the express power of the municipal authorities ordaining it. The devotion by condemnation of the property abutting on both sides of an established boulevard to residential purposes exclusively having been determined by the court to be a public use, the expediency and property of the ordinance under which said use or restriction is authorized are for the municipal legislature, and not a subject of judicial inquiry. *Held*, by WALKER, J., dissenting, with whom DAVID E. BLAIR, J., concurs, that an ordinance attempting, under the guise of the public welfare and ostensibly for public use, to prohibit owners of abutting lots from building any kind of structure within thirty-five feet of an established boulevard and to use the lots for any other than residential purposes, regardless of size, beauty, utility or desirability, is an unreasonable, excessive and unwarranted interference with the rights of private property.

7. ——: ——: **Charter Limitations.** The provisions of the Charter of Kansas City of 1908, providing for building restrictions and the establishment of building lines through the instrumentality of the Board of Park Commissioners and declaring that such provisions shall not apply to boulevards previously established, do not apply to an ordinance devoting property abutting on a previously established boulevard to exclusive residential purposes, establishing a building line for residences thereafter constructed and a benefit district, and providing for assessment of special benefits to pay damages to property owners injuriously affected thereby. By its charter and the statutes the city had such powers of eminent domain, and these provisions did not restrict those powers to property along boulevards already established. *Held*, by WALKER, J., dissenting, with whom DAVID E. BLAIR, J., concurs, that no other provision than these is found in the charter for placing restrictions upon boulevards and their building lines, and no power is therein found authorizing such restrictions by condemnation, and such power not being expressly granted cannot be implied. *Held*, also, that the charter provision, specifically including the subject-matter of establishing building lines for boulevards through the instrumentality of the Board of Park Commissioners, is a special enactment, and excludes any other method, whether expressed or not.

8. ——: ——: **Proceeding Authorized by Charter and Statute: Condemnation for Residential Uses: Educational Benefits: Police Regulation.** The Charter of Kansas City, adopted in pursuance of constitutional authority, provides that the city may acquire, by condemnation or otherwise, lands or other property, for art galleries, museums, educational and other public purposes. The statute (Sec. 8909, R. S. 1919) provides that cities of more than one hundred thousand inhabitants, by the exercise of the power of eminent domain, may acquire "lands for public use, including parks· or for any other public purpose." *Held*, that these provisions of the charter and statute are sufficiently comprehensive to cover a condemnation ordinance, devoting the properties abutting on both sides of an established boulevard to exclusive residential purposes, forbidding the construction thereafter of houses within thirty-five feet of the street line, establishing a benefit district including the boulevard and one hundred and fifty feet on each side thereof, prohibiting the maintenance of bill boards, gasoline tanks and gasoline filling stations within the district, and providing for the assessment of special benefits to pay the damages of property owners injuriously affected thereby. The purpose is education, in that it provides a means of recreation and beautification, and for the enhancement of property·values, and the enlargement of all those elements which tend to promote civic pride and the consequent ·growth of the city and its prosperity.

*Held*, by WALKER. J., dissenting, with whom DAVID E. BLAIR, J., concurs, that the police power does not sanction the confiscation of private property for aesthetic·purposes, and cannot be employed under the guise of the exercise of the power of eminent domain. In the exercise of eminent domain private property is applied to public use, because its enjoyment is beneficial to the public; in the exercise of the police power the owner of private property is denied its unrestricted use, because such use would be injurious to the public welfare, health or morals.

Appeal from Jackson Circuit Court.—*Hon. Allen C. Southern*, Judge.

REVERSED AND REMANDED.

*E. M. Harber* and *Benj. M. Powers* for appellant: *W. C. Scarritt* of counsel.

(1) The protective ordinance has for its scope and purpose a public use as distinguished from a private use. St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; State ex inf. v. Merchants Exchange, 269 Mo. 346, 356; Welch v. Swasey, 214 U. S. 91; Opinion of the Justices, 234 Mass. 597; Welch v. Swasey, 193 Mass. 364; Commonwealth v. Alger, 7 Cush. (Mass.) 53; City of Des Moines v. Manhattan Oil Co., 184 N. W. (Ia.) 823; State ex rel. v. Houghton, 144 Minn. 1; Atty. Genl. v. Williams, 174 Mass. 476; Bunyan v. Commissioners, 167 App. Div. (N. Y.) 457; United States v. Gillesburg El. Ry. Co., 160 U. S. 668; St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269; 1 Nichols on Law Eminent Domain (2 Ed.) 164, secs. 57, 58. Relativity of police power and eminent domain considered. Rideout v. Knox, 148 Mass. 368; Oneonta Light Co. v. Schwarzenbach, 150 N. Y. 76; 1 Lewis, Eminent Domain (3 Ed.) sec. 254, p. 504; 20 C. J. 558, sec. 40; Township Board v. Hackmann, 48 Mo. 243; County Court v. Griswold, 58 Mo. 176; Parker v. Commonwealth, 178 Mass. 199; Laws 1921, pp. 177, 178, 481, 510. (2) If the purpose and object be a public use as distinguished from a private use the necessity and expediency of appropriating any particular property is within the scope of the legislative department of the municipal government and is not subject to judicial inquiry or determination. Kansas City Charter, sec. 1, art. 3; 10 Am. & Eng. Ency. Law, 1052; 20 C. J. 624; Deitrich v. Murdock, 42 Mo. 283; Aldridge v. Spears, 101 Mo. 400; So. Ill. & Mo. Bridge Co. v. Stone, 174 Mo. 1; County Court v. Griswold, 58 Mo. 175. (3) The right of eminent domain is an inherent attribute of sovereignty and it is exercised by the legislative department and not by the judiciary, and that authority is limited, and not granted, by Sections 20 and 21 of Article 2 of the State Constitution, to the effect that the question whether the contemplated use be really public shall be a judicial question, and that private property shall not be taken for public use without just compensation.

20 C. J. 513; So. Ill. & Mo. Bridge Co. v. Stone, 174 Mo. 1; C. B. & Q. Ry. Co. v. McCooey, 273 Mo. 29. (4) The State's inherent power of eminent domain in respect to purely local affairs was automatically delegated to and vested in Kansas City, when that city was organized as a constitutional city in 1908, and it was so vested by Section 16 of Article 9 of the State Constitution. Sec. 16, Art. 9, Mo. Const; Enabling Act, R. S. 1919, sec. 8903-6-10; Kansas City v. Marsh Oil Co., 140 Mo. 458; Kansas City v. Voerishoeffer, 249 Mo. 1; State ex rel. Realty Co. v. Thomas, 278 Mo. 85; Brunn v. Kansas City, 216 Mo. 108; Kansas City v. Bacon, 147 Mo. 257. (5) The power of Kansas City to exercise the right of eminent domain to the full, through its legislative department, consisting of its Mayor and Common Council, to the extent invoked in the protective ordinance, is and was repeatedly declared in its charter, before and irrespective of Sections 40 and 41 of Article 13 and Section 18 of Article 6 thereof, in the most varied and unstinted terms. Sec. 1, Arts. 1, 3, 6, Charter 1908; Sec. 1, Arts. 1, 3, Charter 1889. Like powers in successive charters are continuing powers notwithstanding the adoption of the new charter. City Charter 1908, secs. 30 and 32, Art. 18; Gunning Co. v. Kansas City, 240 Mo. 659. (6) The acquisition of the rights in the nature of negative easements sought to be acquired through the protective ordinance may unquestionably be accomplished through the exercise of the power of eminent domain. State ex rel. v. Houghton, 144 Minn. 1; 1 Nichols on Eminent Domain (2 Ed.) sec. 58; St. Louis v. Hill, 116 Mo. 527; St. Louis v. Dorr, 145 Mo. 466; St. Louis v. Dreisoerner, 243 Mo. 217; Bill Posting Co. v. Atlantic City, 71 N. J. L. 72; City of Passaic v. Paterson B. P. Co., 72 N. J. L. 285; Commonwealth v. Boston Adv. Co., 188 Mass. 348; Kansas City v. Land Co., 260 Mo. 395; Kansas City v. Terminal Ry. Co., 201 S. W. 541; Atty. Genl. v. Williams, 174 Mass. 476; Williams v. Parker, 188 U. S. 491; Brunn v. Kansas City, 216 Mo.

108; Chaplin v. Kansas City, 259 Mo. 479; In Matter of Widening Bushwick Ave., 48 Barb. (N. Y.) 9; In re City of New York, 68 N. Y. Supp. 196. The ordinance with high reasonableness and legal precedent seeks to take only easements and those for a limited period; and these and other details of it are immune from rational criticism. State ex rel. v. Seehorn, 246 Mo. 568; United States v. Welch, 217 U. S. 333; Pacific Postal T. Co. v. Oregon Co., 163 Fed. 967; Hepburn v. Jersey City, 67 N. J. L. 686; Welch v. Swasey, 193 Mass. 364; Welch v. Swasey, 214 U. S. 91; State ex rel. v. Thomas, 278 Mo. 1, 97. (7) Sections 40 and 41 of Article 13 and Section 18 of Article 6 of the City Charter of 1908 are not limitations upon the city's general sovereign power of eminent domain, but the evident purpose in the enactment of them was to enlarge the city's power as to the subjects therein referred to or, at least, to indicate a procedure whereby those respective objects might one by one be accomplished. Those sections do not enumerate nor provide a method of acquiring all the rights deemed good and sought to be acquired by the protective ordinance. and so they do not provide an exclusive method of accomplishing that object, that is, the whole object sought by the ordinance, or debar Kansas City from exercising its general powers in accomplishing that full purpose. State ex rel. v. Thomas, 287 Mo. 85; St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; 2 Lewis' Sutherland Stat. Const. (2 Ed.) sec. 369, sec. 370, pp. 694, 695, 705, 706; Adams v. Yazoo & Miss. Val. Railroad Co., 75 Miss. 275; Dillon Mun. Corp. (5 Ed.) p. 586.

*Smart & Strother* for respondent Thomas A. Smart.

(1) Ordinance 39946, the ordinance in question (called by appellant the "protective ordinance" but more properly named the "prohibitive ordinance") has the earmarks of being founded upon Section 40, Article 13, of the Charter of Kansas City of 1908, which is the only section in the entire charter which authorizes the

establishing of a building line and the establishing of building restrictions, these being the first two restric-tive or prohibitive provisions of the ordinance, but said Section 40 expressly provides that said section applies to boulevards established after the taking effect of said charter, and not to those established prior thereto. That part of Gladstone Boulevard from Independence Boule-vard to a point near Monroe Avenue (and upon which respondent's property abuts) was established in 1893, whereas said charter took effect September 4, 1908. For these reasons said ordinance is unauthorized and in-valid. (2) While that part of Gladstone Boulevard from Elmwood Avenue to Belmont Avenue, a distance of about a mile (toward the east end of said boulevard), which is within the provision of said Ordinance 39946, was established in 1912 long after the charter of 1908 took effect, and while said Section 40 of Article 13 of said charter (and said section only) was applicable to said part of said boulevard in so far as it authorized a building line and building restrictions to be established along the same, yet said ordinance is void because it joins said part of said boulevard which was established after said charter took effect with that part (at the west or south end) from Independence Boulevard to a point near Monroe Avenue, a distance of about a mile (and upon which this respondent's property abuts), which was established long before said charter took effect, and to which said Section 40 is not applicable, nor is any other provision of said charter applicable thereto. Char-ter of Kansas City 1908, sec. 40, art. 13, pp. 437, 438, 439. (3) While said Section 40, Article 13 of the Charter of Kansas City of 1908, is applicable to that part of said boulevard that was established after said charter took effect, yet said ordinance is void for the further reasons: (a) That the owners of a majority in front feet of the lands fronting on said Gladstone Boulevard did not petition for the establishing of the building line and the building restrictions provided for by said Ordi-

nance 39946. (b) That the Board of Park Commissioners did not, in its resolution, nor did the Common Council in said ordinance, find and declare that the owners of a majority in front feet of all lands fronting on said Gladstone Boulevard, on which said restrictions were established by said ordinance, petitioned for the establishment of said building line and said building restrictions, provided for in said ordinance, as expressly required, as a condition precedent, by said Section 40, Article 13. Charter of Kansas City 1908, sec. 40, art. 13, pp. 437, 438; St. Louis v. Gleason, 93 Mo. 37; Pash v. St. Joseph, 257 Mo. 332, 341; Kansas City v. Bacon, 147 Mo. 259, 283. (4) While Ordinance 39946, the ordinance in question, by establishing a building line and building restrictions, which are only authorized by said Section 40, Article 13, of the charter, indicate that it was upon this section that the law-making body of the city looked, while in the act of passing said ordinance, yet the city admits that said ordinance cannot stand upon said Section 40, for the reason that said Section 40 applies to boulevards, established after said charter took effect, and for the further reason that said section was not complied with by the city in the passage of said ordinance; but seeks to sustain the validity of said ordinance upon the general power of the city to condemn private property for public use. We submit that there is no general power conferred upon the city by its charter or otherwise which would authorize the Common Council to exercise a power so far-reaching as to establish a building line and building restrictions upon private property against the will of the owner. ''Without a clear grant of such power, no municipal ordinance [of the sort invoked in this case] could possibly be sustained.'' St. Louis v. Dorr, 145 Mo. 466, 472; St. Louis v. Dreisoerner, 243 Mo. 217, 223. (5) Section 40, Article 13, of the charter being a special law or provision expressly authorizing the establishing of a building line and building restrictions along boulevards estab-

lished after said charter took effect (the only express power in the charter authorizing such restrictions) and being applicable to said part of Gladstone Boulevard between Elmwood Avenue and Belmont Avenue, which was established after said charter took effect, the building line and building restrictions, provided for in said Ordinance 39946 along said part of said boulevard could be established only by a strict compliance with said Section 40, and no general provision in the charter will be construed as abrogating or excusing the failure to perform the requirements of such special law. The requirements of said Section 40 not having been complied with said ordinance is invalid. Jaicks v. Merrell, 201 Mo. 91, 105; State v. Butler, 178 Mo. 272, 302; 2 Dillon on Municipal Corporations (5 Ed.) sec. 586, p. 921; Charter of Kansas City 1908, last sentence par. 41, sec. 1, art. 3, p. 163. (6) The third restriction or prohibitive provision in said ordinance is that "no bill boards shall be erected, maintained or used during that period" (twenty years) "within the said benefit district." Section 18, Article 6, of the Charter of 1908 (p. 218), provides that "the Common Council may, by ordinance, prohibit the construction or maintenance of bill boards," but it also requires that "such ordinance shall prescribe the size, character and location of such advertising boards and structures so prohibited," and then provides for condemnation proceedings in order to pay compensation to private property if damaged. Said Ordinance 39946, the ordinance in question, fails to state the size and character of bill boards prohibited, and for this reason it is in violation of said Section 18, and void. Charter of Kansas City (1908), sec. 18, art. VI, p. 280. (7) Section 18 of Article 6 of said charter authorizes the prohibition of bill boards, also expressly provides that "the same procedure for the ascertainment and assessment of just such compensation . . . and the manner of the payment of such damages shall be adopted as is prescribed by sections two, three and four of this ar-

ticle relating to proceedings for condemning and damaging private property;'' whereas Ordinance 39946 provides that said proceedings shall be ''all in accordance with-Article XIII of the Charter of Kansas City with the same force and effect as though this ordinance were an ordinance duly authorized and enacted for the purpose of taking and condemning lands for park purposes.'' Said Article VI and said Article XIII being unlike and antagonistic to each other in reference to the condemnation proceedings respectively prescribed therein, said Ordinance 39946, for the reasons aforesaid, is void. Charter of Kansas City 1908, sec. 18, art. 6, pp. 280, 281; Idem. secs. 2, 3 and 4, art. 6, pp. 254 to 263; St. Louis v. Bell Realty Co., 259 Mo. 126-136. (8) The ordinance in question, in its application to respondent's said property, is grossly unreasonable, oppressive and unjust and, for this reason, is null and void. St. Louis v. Handlon, 242 Mo. 88, 96; St. Louis v. Dreisoerner, 243 Mo. 217, 224; Union Cemetery Assn. v. Kansas City, 252 Mo. 466, 500; City of Plattsburg v. Hagenbush, 98 Mo. App. 669; Corrigan v. Gage, 68 Mo. 541; Springfield v. Jacobs, 101 Mo. App. 339; Hyde v. Kansas City, 196 Mo. 498; Stoltman v. City of Clayton, 226 S. W. 321, 205 Mo. App. 568; Willison v. Cook, 54 Colo. 335; Crawford v. City of Topeka, 51 Kan. 756. (9) The ordinance in question, in its application to respondent's said property, is lacking in equality and uniformity and denies to this respondent the equal protection of the laws guaranteed to him by the 14th Amendment of the Constitution of the United States. St. Louis v. Handlon, 242 Mo. 88; Wetterau v. Farmers & Merchants Trust Co., 226 S. W. 941; Gast Realty & Investment Co. v. Schneider Granite Co., 240 U. S. 55, 60 L. Ed. 523; Hayes v. Poplar Bluff, 263 Mo. 517, 533. (10) The ordinance in question grants to the owners of the thirty-four residences fronting on Gladstone Boulevard between Independence Boulevard and Anderson Avenue special and exclusive rights, privileges and immunities in this that

said owners enjoy the use of their property within the thirty-five foot building line fixed by said ordinance for the location of their respective residences, whereas this respondent is, as to his said vacant lots, denied the right to use said thirty-five foot strip or any part thereof for any such purpose, in violation of Clause 26, Section 53, Article IV, Constitution of Missouri. Hayes v. Poplar Bluff, 263 Mo. 516, 533; St. Louis v. Handlon, 242 Mo. 88, 96. (11) The court will look, not only at the face of the ordinance, but outside at the physical facts in order to determine whether such ordinance is reasonable or unreasonable or whether it is lacking in equality and uniformity or not. Stegmann v. Weeke, 214 S. W. 140; Union Cemetery Assn. v. Kansas City, 252 Mo. 500; Watterau v. Farmers & Merchants Trust Co., 226 S. W. 942. (12) The ordinance in question, Number 39946, cannot be justified or sustained under the exercise of the police power of Kansas City. For the police power—however far reaching it may be—can only regulate or restrain the use of private property when such use is injurious to the health, safety, morals or general welfare of the public and when this use is not injurious, it is not within the zone of the police power. Spann v. City of Dallas, 235 S. W. 513; St. Louis v. Hill, 116 Mo. 527; St. Louis v. Dorr, 145 Mo. 466; St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; Willison v. Cooke, 54 Colo. 320, 44 L. R. A. (N. S.) 1030; Kansas City Gunning Co. v. Kansas City, 240 Mo. 659; Levy v. Mravlog, 115 Atl. (N. J.) 350; Passaic v. Paterson Bill Posting Co., 72 N. J. L. 285; Crawford v. Topeka, 51 Kan. 756; Bryan v. City of Chester, 212 Pa. St. 259; Haller Sign Works v. Physical Culture Training School, 249 Ill. 436, 34 L. R. A. (N. S.) 998; Bryne v. Maryland Realty Co., 129 Md. 202, L. R. A. 1917 A. 1216; 2 Dillon on Municipal Corporations (5 Ed.) sec. 695; Eubanks v. Richmond, 226 U. S. 137, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cases, 1914 B, 192. (13) There can

be no presumption that the uses, prohibited by said ordinance, will constitute a nuisance or be injurious to the public welfare, but, on the contrary, the court will presume all such uses will be exercised by the owners of private property fronting on Gladstone Boulevard in an orderly and legal manner. (14)   If this court find that any one of the five uses prohibited by said ordinance is properly prohibited in the exercise of the police power, because such use, so prohibited, constitutes a nuisance or a danger to the public welfare, then, for such prohibited use of his private property, the owner would be entitled to no compensation, it being *damnum abseque injuria*. In this event, the ordinance would be void for assessing private property to pay damages which have no legal existence. 12 Corpus Juris, 905; Loan Assn. v. Topeka, 20 Wall. 665; Cole v. LaGrange, 113 U. S. 1.   (15)   Independent of what has been said above, the ordinance cannot be sustained under the power of eminent domain, because the enforcement of the restrictions described in said ordinance, whether viewed singly or collectively, does not constitute a taking or damaging of private property for any public use whatever, and for this reason, said ordinance violates the provisions of Sections 4, 20 and 30, Article II, Constitution of Missouri, and the Fourteenth Amendment, Constitution of the United States.   Farist Steel Co. v. City of Bridgeport, 60 Conn. 278; Hyde v. Kansas City, 196 Mo. 498; City of Richmond v. Carneal, 106 S. E. 403; Lewis on Eminent Domain (3 Ed.) sec. 257, p. 504, also sec. 256; Dillon on Mun. Corp. (5 Ed.) sec. 1011, p. 1602; 1 Lewis, Eminent Domain (3 Ed.) sec. 1, p. 1, sec. 257, p. 504, sec. 258, p. 506; Chesapeake Stone Co. v. Moreland, 126 Ky. 656; Alfred Phosphate Co. v. Duck River Phosphate Co., 120 Tenn. 260, 113 S. W. 412; Loan Assn. v. Topeka, 20 Wall. 665; Cole v. LaGrange, 113 U. S. 1; Commonwealth v. Alger, 7 Cush. (Miss.) 53, 85.   (16)   Aesthetic considerations or purposes alone will not justify the exercise either of the po-

lice power or of the power of eminent domain. City of St. Louis v. Dreisoerner, 243 Mo. 217; Byrne v. Md. Realty Co., 129 Md. 202, 209; Haller Sign Works v. Physical Culture Training School, 249 Ill. 436; Passaic v. Paterson Bill Posting Co., 72 N. J. L. 285; Bryan v. City of Chester, 212 Pa. St. 259. (17) Kansas City is a constitutional city (like St. Louis) and is organized under Section 16, Article IX of the Constitution of Missouri. As such municipal corporation, it only possesses and can exercise the following powers: (a) those granted in express words; (b) those necessarily or fairly implied in or incident to the powers expressly granted (c) those essential to the declared objects and purposes of the corporation—not simply convenient but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. St. Louis v. Dreisoerner, 243 Mo. 223; Hays v. Poplar Bluff, 263 Mo. 516, 531. (18) The power to take private property for public use without the consent of the owner is in derogation of the rights of the citizen, and can only be justified on grounds of absolute necessity; and, when exercised, the power conferring the right must be strictly adhered to and complied with. It is no answer to say that certain things in a given enactment, conferring the authority, do not appear to be essential. Everything is essential which the law has said should be done before this high prerogative right can be carried out and enforced. Leslie v. City of St. Louis, 47 Mo. 474, 477; 20 C. J. 883.

*A. N. Gossett* for Respondent Small; *John G. Park* for Respondent Liebi.

(1) The proposed taking under Ordinance No. 39946 is not for public use and would violate Article II, Section 20, of the Mo. Constitution. Taking for an aesthetic purpose, or for sport or pastime, is not a

public use. Cooley's Constl. Lim. (7 Ed.) p. 768; 1 Lewis on Em. Dom. (3 Ed.) pp. 506, 507, 508; Penns. Ins. Co. v. Phila., 242 Pa. 47, 49 L. R. A. (N. S.) 1062; Albright v. Park Comrs., 71 N. J. L. 303, 309, 108 Am. St. 749, 69 L. R. A. 768; Farist Steel Co. v. Bridgeport, 60 Conn. 278, 292; Woodstock v. Gallup, 28 Vt. 587; Gardner v. Newburgh, 2 Johns. Ch. 162, 167, 7 Am. Dec. 520, 529; Gt. Falls Power Co. v. Railroad, 104 Va. 416; In re Niagara Falls Co., 108 N. Y. 375. The taking must be for a use by the public. Kansas City v. Hyde, 196 Mo. 498, 507, 512; Gaylord v. Sanitary Dist., 204 Ill. 576, 63 L. R. A. 582, 98 Am. St. 235. If the improvement was effectuated, the public would not be in possession, and the property would not become public property in any sense. Pa. Mut. Ins. Co. v. Phila., 242 Pa. 47, 49 L. R. A. (N. S.) 1062; Cooley on Const. Lim. (7 Ed.) p. 766. If it were effectuated the Board of Park Commissioners could not control the property acquired. If it were effectuated, the tax burden would be where it is today. The ordinance would take from respondents their property in order to confer a benefit upon others, which is no public use. Kansas City v. Hyde, 196 Mo. 498, 512; Pa. Mut. Ins. Co. v. Phila., 242 Pa. 47, 49 L. R. A. (N. S.) 1062. (2) The true purpose of Ordinance No. 39946 is to unlawfully extend the police power and to prohibit useful industries and harmless business within the restricted area, contrary to settled doctrines of this court. St. Louis v. Dreisorner, 243 Mo. 217, 41 L. R. A. (N. S.) 177; St. Louis v. Dorr, 145 Mo. 466, 42 L. R. A. 686, 68 Am. St. 575. It is unconstitutional to forbid a lawful business Spann v. Dallas, 235 S. W. 513; State v. Sperry Co., 94 Neb. 785, 49 L. R. A. (N. S.) 1123; Tolliver v. Blizzard, 143 Ky. 773, 34 L. R. A. (N. S.) 890. There is a strong analogy between the police power and the power of eminent domain. 1 Lewis on Em. Dom. (3 Ed.) sec. 6, p. 16; 1 Nichols on Em. Dom. (2 Ed.) pp. 53, 54. The courts may inquire as to the true purpose and effect of an ordinance to condemn

property.  Kansas City v. Hyde, 196 Mo. 498, 513.  (3) Ordinance 39946 is not maintainable as a lawful eminent domain proceeding, because: (a) The taking is forbidden by the charter.  (Art. 13, Sec. 40).  Gladstone Boulevard antedates the present charter.  (b) The charter framers proposed one particular way, and only one, for affixing such restrictions.  The people adopted the proposal and enacted that there should be but one way for imposing restrictions.  These were declarations that under no other circumstances might restrictions be imposed by law.  Schmidt v. Densmore, 42 Mo. 225, 236; St. Louis v. Dorr, 145 Mo. 466, 472; St. Louis v. Kaime, 180 Mo. 317.  Expression of the one excludes all others. State ex inf. v. Sweeney, 270 Mo. 685.  (c) The only provision of the law which might in any way justify Ordinance No. 39946 is Art. 13, secs. 40 and 41.  That provision is inapplicable because: Gladstone Boulevard antedates the charter of 1908.  The ordinance was not approved by the park board.  A sufficient number of the abutting owners did not petition.  The park board did not find that the majority had filed petition.  The council did not find that a majority of such abutting owners had filed petition.  No resolution of the park board established restrictions.  The proposed restriction is 150 feet on either side of the boulevard.  Article 13, Section 40, contemplates one 50 feet wide on either side.  (4) It is not authorized by any statutory or charter provision.  The power must be distinctly conferred.  36 Cyc. 1179-1180; Schmidt v. Densmore, 42 Mo. 225, 234; St. Louis v. Dorr, 145 Mo. 466, 472; Belcher Sugar Co. v. El. Co., 82 Mo. 121; Miss. Bridge Co. v. Ring, 58 Mo. 491; 20 C. J. 533-535.  Legislature cannot authorize condemnation of land adjacent to a boulevard for the purpose of selling or leasing it to others.  Opinion of Justices, 204 Mass. 607.  (5) The land proposed to be condemned is the benefit district.  This is confiscation and violates Amendment XIV of the Constitution of the United States.  No genuine benefit district is created and

there is no provision for assessing benefits against the city at large. There is no real provision for compensation, and the ordinance violates Article II, Sections 21 and 30, of the Constitution of Missouri. Norwood v. Baker, 172 U. S. 269, 43 L. Ed. 443. (6) This is not a proceeding to condemn property for park, parkway or boulevard purposes, nor is it a permanent appropriation, as provided and required by Article 13 of the city charter. (7) Kansas City has no power to establish a building line without respondents' consent, by condemnation or otherwise. (8) Ordinance No. 39946, sec. 5, provides that the proceedings shall be conducted under Article 13 of the charter. Article 13 does not contemplate proceedings for exclusion of bill boards. (9) A substantial amount of respondents' lands affected by Ordinance No. 39946 does not abut upon parks or boulevards under direction of the park board, but upon streets regulated by the board of Public Works, who have never approved this ordinance. Nor does this board have any jurisdiction over St. John Avenue, 400 feet of property on each side of which is attempted to be restricted in this proceeding. (10) The only means provided for paying the damages is by special assessments upon property in the alleged "benefit district," from all of which the same valuable rights are withdrawn. The power to levy special assessments must clearly appear and be expressly provided. It is a power exercised against common right. 28 Cyc. 1102, 1105-1106. No power to levy a special assessment for such purpose is shown to exist, and no express power is claimed to exist. The proposal to levy such assessments, therefore, does not exist. (11) Ordinance No. 39946 is highly unreasonable, confiscatory and detrimental, as it prevents respondents building as near the boulevard as their neighbors have done. St. Louis v. Handlan, 242 Mo. 88, 97. Art. 13, sec. 8, of the charter provides for the condemnation of "lands" for park purposes. Under this provision there can be no appropriation of an interest short of the entire estate.

20 C. J. 594, note 39. Reasonableness of this ordinance was a question for the court. Am. Tel. Co. v. St. Louis, 202 Mo. 656, 680.

WHITE, J.—This is a proceeding to restrict the use and to condemn certain rights in property along Gladstone Boulevard in Kansas City, under Ordinance No. 39946, called a "Protective Ordinance."

Owners of certain property abutting on Gladstone Boulevard and within a benefit district were made defendants. Five defendants appeared and filed separate motions to dismiss the proceeding. The motions of two of these, Fred Liebi and T. A. Smart, with a supplemental motion of Smart, are set out in the record. The other motions are not in the record. All the motions to dismiss were sustained December 15, 1921, the cause dismissed and the plaintiff appealed.

In addition to the defendants who moved to dismiss, forty-six defendants appeared and filed their joint answer, expressing their satisfaction with the proceeding and praying the court to carry it into effect.

The proceeding affects Gladstone Boulevard from Independence Boulevard to Wheeling Avenue, a distance of about three miles. Section 1 of Ordinance No. 39946 recites that Gladstone was the first boulevard or parkway established in the city, and that all the buildings along its entire length are used exclusively for residential purposes, and that the overwhelming sentiment of the property owners immediately interested and of all citizens who desire to make Kansas City a good place to live in, is that the enactment and enforcement of the ordinance would "enhance and stabilize the value and utility of each and every piece of property within the benefit district herein prescribed and add to the beautification of said highway and North Terrace Park." Section Two of the ordinance is as follows:

"Section 2. From and after the enactment of this ordinance no house or building shall be constructed in

whole or in part within thirty-five feet of the nearest adjacent side line of said boulevard within twenty years from the enactment of this ordinance, nor shall any house or building within the said benefit district be used within that period for any other than residential purposes or for purposes that are incidental and appurtenant to residential uses. No bill boards shall be erected, maintained or used during that period within the said benefit district. No gasoline tank, or gasoline tanks used in connection with others having a capacity of more than one hundred gallons shall be placed at one locality within the said benefit district during said period, nor shall any gasoline filling station be erected or maintained within said district during said period.''

Section 3 provides for a benefit district comprising all lands on either side of Gladstone Boulevard between Independence Boulevard and Wheeling Avenue, lying within one hundred and fifty feet of the respective side lines of said boulevard, and provides certain methods of measurement for laying out the lines.

Section 4 provides for a condemnation proceeding to determine the damage, if any, which the several property owners within the said benefit district might sustain by reason of the enactment and enforcement of the ordinance, and the manner in which the proceedings should be prosecuted.

Section 5 of the ordinance provides that damage caused by the enforcement of the ordinance should be paid for by special assessment upon real property situated within the benefit district.

Section 6 recites that the Common Council shall prescribe the terms and describe the limits within which property shall be benefitted by this ordinance and assessed to pay the damages.

Section 7 provides that within a period of twenty years the ordinance could be repealed only upon petition of a majority of the owners of private property abutting upon the boulevard and within the benefit district.

The motions to dismiss allege numerous grounds why the proceeding should not be maintained. These may be classified in general as:

(1)   Those which questioned the constitutionality of the ordinance and the proceeding. It is claimed that the ordinance and the proceeding are contrary to Sections 20, 21 and 30 of Article 2 of the Constitution of Missouri, and the Fourteenth Amendment to the Constitution of the United States. The briefs and arguments of the respondent upon this point mainly go to the provision of Section 20, Article 2, that no private property can be taken for private use except for certain given purposes, and the provision of Section 21, that property shall not be taken nor damaged for public use without just compensation.

(2)   Those which asserted reasons why the proceeding is not authorized by the charter of Kansas City. Several questions are presented in considering the charter power of the city, which will be noticed later in the opinion.

On the hearing of the motion the movers introduced evidence to show that some of the buildings upon the boulevard were much nearer than the thirty-five feet. Section Two does not require buildings already on the property to be moved, but prohibits any building to be constructed within less than thirty-five feet of the nearest side line, after the enactment of the ordinance. A petition signed by one hundred and seven persons interested in the development of Gladstone Boulevard urging the immediate passage of the ordinance, and suggesting certain changes in it, was offered by the defendants to show that the petition was not in accordance with the provisions of the charter. It was shown that no other petition was on file in the office of the city clerk having reference to the subject-matter of the ordinance.

The city offered as witnesses a number of persons who owned property on Gladstone Boulevard, as well as

real estate men, to show that the erection of structures
forbidden by the ordinance would injure the boulevard
for residences. Several witnesses testified that the
value of property on the boulevard would be greatly ap-
preciated by enforcement of the ordinance; that because
of benefits arising from the scheme the enhanced value
of the property affected would be much more than the
damages to property owners. Mr. George E. Kessler,
landscape architect, gave his idea of zoning in a city:

"Q. What do you understand city zoning to be?
A. An assembling of the uses of lands for their var-
ious purposes in given areas and an attempt to antici-
pate expansion; and in order to bring about a greater
stability; and an ascertainment of this the uses of the
property in a rational way throughout the city; placing
of limiting lines, throughout the city in different areas;
classifying their use into, principally, industrial areas,
commercial areas, residential areas; and again subdivid-
ing those areas into further smaller units for different
uses that would be applicable within its activities. This
has usually been done on the broadest scale in recent
years, say, only five or six years, under the usual State's
powers, or police powers of the State, but for very many
years before, both on the European Continent and in the
United States, there have been efforts to bring about
the same results of stability of property through the
right of eminent domain, establishing building lines, es-
tablishing areas of use so that invasion of contrary uses
would be checked, and thereby preventing the very great
losses that have occurred in most American cities by
the need of shifting from one area to another, due to un-
necessary or untimely invasion of contrary uses."

It was shown that Gladstone Boulevard was essen-
tially a residence district, and values along the boule-
vard were based on the use of the land for dwellings;
that use for any other purpose would have a tendency
to destroy values. It was said that establishment there
of business enterprises would immediately reduce its
value for residence purposes, including a very large

area immediately adjoining the property on which such business might be placed. The purpose was thus expressed:

"A. Primarily, the purpose, of course, is to give outdoor recreation. The good appearance and attractiveness is a very distinct value, not usually considered as the prime element, but is one of the large factors in establishing pleasant use. Attractive surroundings always give a greater consciousness of the better things in a community and finally through that very attractiveness increase and sustain the city's growth and the comfort and welfare of the people living, regardless of those who may come."

All this evidence was introduced without objection, generally being the opinions of real estate experts and of experts upon city planning.

The trend of the evidence was that the planning of the city in relation to the use of different parts would tend to prevent overcrowded and congested districts, thereby promoting health and the general welfare of the city, would make the city more attractive and thereby promote its growth and general prosperity—afford means of recreation to people who desired to drive or walk along such streets in the same way that a public park or playground would.

I. The propriety, expediency and necessity of a legislative act are purely for the determination of the legislative authority, and are not for determination by the courts. That applies to a municipal ordinance authorized by statute. A legal presumption of its validity attends the ordinance under consideration and if there is doubt as to its constitutionality we must hold it to be constitutional. [County Court of St. Louis County v. Griswold, 58 Mo. 175, l. c. 192-193; State ex inf. v. Merchants Exchange, 269 Mo. 346, l. c. 356.] These fundamental principles should be stated now and then in view of the popular notion that courts go out of their way to nullify a legislative act.

*Legislative Power.*

II.   It is contended here that Ordinance No. 39946 has not for its purpose a "public use" of the property affected, which is a matter for the determination of the courts, under Section 20, Article II of the State Constitution.

**Public Use.**

No satisfactory definition of the term "public use" has ever been achieved by the courts.   Two different theories are presented by the judicial attempts to describe the subjects to which the expression would apply. One theory of "public use" limits the application to "employment," "occupation."   A more liberal and more flexible meaning makes its synonymous with "public advantage," "public benefit."   [20 C. J. p. 552, sec. 39; 1 Lewis, Eminent Domain, sec. 257; 1 Nichols, Eminent Domain, sec. 40.]

The first theory, advocated by respondents, is expressed in a quotation from Cooley on Constitutional Limitations, as follows: "The public use implies a possession, occupancy and enjoyment of land by the public at large, or by the public agencies."

Nichols on Eminent Domain (Vol. 1, pp. 130-131) thus generalizes the more liberal interpretation of the term: "Anything which tends to enlarge the resources, increase the industrial energies, and promote the productive powers of any considerable number of the inhabitants of a section of the State, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor, manifestly contributes to the general welfare and the prosperity of the whole community, and, giving the Constitution a broad and comprehensive interpretation, constitutes a public use."

A little investigation will show that any definition attempted would exclude some subjects that properly should be included in, and include some subjects that must be excluded from, the operation of the words "public use."

Naturally a definition or description of the limits of "public use" is likely to vary with the character of case

in which the term is employed. The expenditure of public money for pure ornamentation, statuary, pictures and the like; the condemnation of property for the alleged public purpose with compensation to the owner; the enforcement of a pure police regulation for public safety where no compensation is contemplated—each of these different circumstances naturally causes a different application of the term.

As might be expected, the more limited application of the principle appears in the earlier cases, and the more liberal application has been rendered necessary by complex conditions due to recent developments of civilization and the increasing density of population. In the very nature of the case, modern conditions and the increasing interdependence of the different human factors in the progressive complexity of a community, make it necessary for the government to touch upon and limit individual activities at more points than formerly.

In order to constitute public use it is not necessary that the whole community or any large part of it should actually use or be benefitted by a contemplated improvement. Benefit to any considerable number is sufficient. [4 Words & Phrases (2 Ed.) p. 44.] Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character. [West v. Whitehead, 238 S. W. (Tex.) l. c. 978; Henderson v. Lexington, 22 L. R. A. (N. S.), l. c. 80; 20 C. J. p. 558.]

III. The taking for "public use," when applied to land, is not limited to actual occupation by the public. Any regulation which imposes a restriction upon the use of property by the owner, and any neighboring public improvement which tends to impair the enjoyment of property by affecting some right or easement appurtenant thereto, may be, under certain circumstances, a public use within the meaning of the Constitution. [1 Nichols on Eminent Domain, sec. 101, p. 280; 10 R. C. L. p. 73.]

In the recent case of Peters v. Buckner, 288 Mo. 618, where the owners of property in a large addition had received deeds with building restrictions, in an action to condemn two blocks in the addition for school purposes it was held that every owner of property in the addition had an easement in the blocks taken and should be compensated in damages which might accrue to each individual lot. That is, the condemnation reached not only the blocks of ground actually used for school purposes, but it also reached the intangible easement in that property appurtenant to a lot several blocks away; the owner of each lot had a right to the maintenance of the restrictions and that right was condemned for public use.

Consideration of some of the cases in various jurisdictions sustaining the constitutionality of zoning ordinance is important as throwing light on the attitude of the courts regarding the subject. The validity of a statute limiting, in the city of Boston, buildings to a certain height in one part of the city and to another height in another part of the city, was attacked in the case of Welch v. Swasey, 214 U. S. 91, and was heard on writ of error from the Supreme Court of Massachusetts (193 Mass. 364.) It was claimed that this statute was unconstitutional, and the purpose did not justify the exercise of public power, because the real purpose was of an aesthetic nature, designed purely to preserve architectural symmetry and a regular sky line. It was further contended that the statute was unreasonable. The Federal Supreme Court, 214 U. S. 1. c. 106, sustained the ruling of the Massachusetts Supreme Court, holding that regulations in regard to the height of buildings were made by the Legislature for the safety, comfort, and convenience of the people, or for the benefit of the property owners generally and were valid, and that the statute was not unreasonable.

In Attorney-General v. Williams, 174 Mass. 476, an act of the Legislature limiting the height of buildings around Copley Square in the city of Boston, but permitting towers, domes and sculptured ornaments to ex-

tend above the regulation height, was declared constitutional. The restriction was held to be for public use, on the theory that the grounds of the park were enjoyed by the people that used them, and the park administered not only to the coarser senses but was in the highest sense educational. The statutes provided for compensation to persons damaged by the enforcement of the restriction.

In the case of State v. Houghton, 176 N. W. 159, the Supreme Court of Minnesota had under consideration the constitutionality of an act providing for residence districts in cities of the first-class and prohibiting the erection in such residence districts of certain business structures. The court reviewed the authorities at length and held the act constitutional. The opinion quotes also from an earlier Minnesota case to the effect that the term "public use" is flexible and cannot be limited to the public use known at the time of the framing of the Constitution (1. c. 161). The court thus states the historical expansion of "public use" at page 161:

"In comparatively recent times it was questioned whether a public use extended so far as to justify the condemnation of property and the expenditure of money for public parks, or for boulevards, or for pleasure drives, or for public baths, or for playgrounds, or for libraries and museums, or for numerous other purposes which contribute to the general good. Now condemnation and expenditure for these and like or similar purposes is common, and recognized as lawful. Not so very long ago there would have been a revolt against restricting a property owner in the full use of his lot to the street line. But a condemnation for the purpose of widening a street by adding a strip on each side, which is not to be used for travel, but for ornament and beauty, and with the reservation of a limited use in the owner, is held valid."

The opinion then cited many cases illustrative of the more liberal doctrine interpreting public use.

The Supreme Court of Massachusetts on a request of the House of Representatives of that State, gave their opinion on the constitutionality of a contemplated zoning act, and held the act would be constitutional, using this language (234 Mass. 603-604): ''Intelligent municipal planning to the end of furnishing access to pleasant natural scenery was recognized and held by this court many years ago to warrant the exercise of the power of eminent domain and the expenditure of public moneys. [Higginson v. Nahant, 11 Allen, 530-536.] Legitimate expenditures of public money and exercise of eminent domain cover a broader field than does the public power in its limitations upon the rights of use of private property.''

That statement of the extent of the State's exercise of eminent domain is generally recognized by the authorities. [20 C. J. 519.] Other pertinent cases are Zircle v. Southern Railway Co., 102 Am. St. l. c. 813; Cochran v. Preston, 108 Md. 220; Eubank v. City of Richmond, 226 U. S. 137.

An examination of cases in this State will show this court is inclined to a more liberal application of the term ''public use.'' As early as 1874, in considering the act establishing Forest Park entirely outside the city limits of Saint Louis, this court held that act to be constitutional. [St. Louis County v. Griswold, 58 Mo. l. c. 192-193.]

In the case of the City of St. Louis v. Hill, 116 Mo. 527, l. c. 535, this court had under consideration the constitutionality of a boulevard law, and an ordinance in pursuance of it which provided that houses to be erected on Forest Park Boulevard should conform to certain building lines forty feet distant from the line of the street. This court held the act unconstitutional, because it made *no provision for compensation for those whose property was restricted* and no such provision was contained in the ordinance (l. c. 536). No other objection to the validity or constitutionality of the ordinance was mentioned.

In the case of St. Louis v. Dorr, 145 Mo. 466, l. c. 485, this court had under consideration an ordinance providing that houses fronting certain streets should be used for residence only. The court held that the Scheme and Charter of the city of St. Louis did not authorize the ordinance, but citing the Hill Case, 116 Mo. 527, it was indicated that if the ordinance were authorized by the charter and provided for a compensation to owners on account of the restrictions imposed, it would be constitutional.

In the case of St. Louis Gunning Company v. St. Louis, 235 Mo. 99, this court held that under its police power the city had a right to regulate without compensation the size and position of bill boards along the streets, for the reason that the regulation of bill boards would tend to prevent crimes and disorders and promote the safety, welfare and enjoyment of the people. The validity of the bill board ordinance arose in the case of the Kansas City Gunning Co. v. Kansas City, 240 Mo. 659, and it was held that the regulation of bill boards was within the power of the city, excepting one section which was conceded to be invalid. That case, as well as the St. Louis Gunning Company Case, got before the Federal Supreme Court, 249 U. S. 269. In quoting the St. Louis Gunning Case, 249 U. S. l. c. 274, the court approved the doctrine announced where the ordinance prohibited bill boards in residence districts of the city, "in the interest of the safety, morality, health and decency of the community." In that case it was held also that the city might discourage bill boards by a high tax "even apart from the right to prohibit them altogether asserted in the Cusack Company Case."

There is not a single argument or reason advanced in favor of the constitutionality of an act or an ordinance providing for a public park, or for a parkway along the street between the sidewalk and the driveway, over which the public cannot travel, which does not apply to the ordinance in this case. The parkway along

the street is not traveled, it is not taken in possession by the public in the sense that the public occupies it; it is merely ornamental, but tends to enhance the attractiveness of a street and the value of property upon a street. It has an educational value and promotes the physical enjoyment of people who travel the street: All of which applies to Gladstone Boulevard with the proposed restrictions.

Section 2 of the ordinance provides for a building line thirty-five feet from the street for buildings thereafter constructed; prohibits buildings other than for residential purposes, including gasoline tanks of capacity more than one hundred gallons, filling stations, and billboards. Any person damaged by such restrictions is to be compensated in the manner provided. Each and all of those restrictions, and restrictions of like character, have been held legitimate exercise of the sovereign power of the State in the interest of health, safety, morality, general enjoyment and education of the community. We hold, therefore, that the ordinance is constitutional.

IV. Another point against Section Two is urged with great pertinacity by respondents—that it is unreasonable. And they point to the general doctrine that a court will nullify an ordinance because **Unreasonable Ordinance.** of its unreasonableness in its operation upon the persons affected.

Usually an ordinance will not be declared unreasonable if it is within the express power of the municipal authorities which ordain it. The question usually arises regarding a regulatory ordinance claimed to be within the merely implied powers of a municipal corporation. [Dillon on Mun. Corp. (4 Ed.) 405; Coal-Float v. Jeffersonville, 112 Ind. 15; 28 Cyc. pp. 369-370.]

In a condemnation proceeding the court having determined that the proposed use is a "public use," the expediency and propriety of the enactment under which it is authorized are for the legislative body and not a

subject of judicial inquiry. [So. Ill. & Mo. Bridge Co. v. Stone, 174 Mo. 1; Aldridge v. Spears, 101 Mo. 400.] In the case of a municipal ordinance proposing to take property for public use, where the charter of the municipality authorized the proceeding, the passage of the ordinance is conclusive as to the necessity and reasonableness of it. [Cape Girardeau v. Houck, 129 Mo. 607; State ex rel. v. Engleman, 106 Mo. 628; Kansas City v. Mo. Pac. Ry. Co., 229 S. W. l. c. 773.] In cases cited by the respondents in support of their position, such as St. Louis v. Handlan, 242 Mo. 88, the ordinances were held invalid because not within the charter power of the municipality which ordained them. In cases where municipalities proceed by ordinance to condemn property for public use, the question of the reasonableness or unreasonableness of an ordinance does not arise. The question for the courts in such cases is whether under its charter powers the municipality has a right to condemn property for the purposes contemplated, and whether the use is a public use.

V. Respondents urge that the proceeding in this case is not within the charter powers of Kansas City. They point to Sections 40 and 41, Article 13, of the charter, as providing a method by which the purpose contemplated here may be carried through. Charter Methods. These sections provide for building restrictions and for the establishment of building lines through the instrumentality of the Board of Park Commissioners. The proceeding in this case does not conform to the method provided for in those sections of the charter. A further objection to the proceeding is that this charter was adopted in 1908, and Sections 40 and 41 provide they shall not apply to any boulevard, etc., established prior to the taking effect of the charter. Gladstone Boulevard was established long before that. Neither by the terms nor by intendment can it be said that the subjects to which those sections of the charter *do not apply* are governed by them. If the charter of

Kansas City and the general laws of the State author-
ize the city to proceed by ordinance in the manner in
which it is proceeding here, then the adoption of Sec-
tions 40 and 41 and the restriction of their operation to
*future* thoroughfares would not prohibit the proceeding.
Those sections simply provide what the municipal au-
thorities suppose to be a practical method by which the
property along future thoroughfares may be regulated.
It did not prohibit nor restrict the powers of the city with
regard to property along thoroughfares already estab-
lished.

VI. It remains to inquire whether Kansas City
under its charter and the general laws had authority to
condemn property for the purpose mentioned. Section
16, Article 9, of the Constitution of Missouri, authorizes
a city of more than one hundred thousand inhabitants
to frame a charter for its "own government
consistent with and subject to the Consti-
tution and the laws of this State." In
pursuance of that authority Kansas City
adopted its charter. Section 1, Article 1, of the Charter
adopted in 1908 provides that the city may "acquire by
gift . . . condemnation proceeding or otherwise
. . . lands or other property" for certain public pur-
poses. The section then provides that the city might
acquire in the manner aforesaid: "any property real,
personal or mixed for *art gallaries, museums, education-
al,* benevolent, charitable or *other public purposes, what-
soever.*"

It is not claimed that the provision is unconstitution-
al. It is certainly comprehensive enough to cover any
purposes for which the city authorities might deem it
necessary to condemn property, provided the use for
which it was taken was a public use, and of the same
general character as those specifically mentioned.

Section 8906, Revised Statutes 1919, relating to cities
of more than one hundred thousand inhabitants, pro-
vides that such cities may acquire and hold by gift, etc.,

"by the exercise of the power of eminent domain by condemnation proceedings, lands for public use" for certain public purposes mentioned, including parks, "or for *any other public purpose* and to provide for managing, controlling and policing the same." Other sections of the charter also bear upon the subject and have been held by this court to invest Kansas City "with the power of eminent domain for the condemnation of property for public purposes." [State ex rel. Realty Co. v. Thomas, 278 Mo. l. c. 95; Kansas City v. Oil Co., 140 Mo. 458; Brunn v. Kansas City, 216 Mo. l. c. 117; Kansas City v. Woerishoeffer, 249 Mo. l. c. 46, and cases there cited.]

Those provisions in the charter, and Section 8906, Revised Statutes 1919, are comprehensive enough to cover the ordinance and the proceeding here. The purpose is educational, means of recreation, enhancement of property values, and all those elements which promote civic pride and consequent growth and prosperity of the city.

VI. The rulings of the Federal Supreme Court in the case mentioned under Paragraph III above sufficiently answer the contention of the respondents that the proceeding here is contrary to the Fourteenth Amendment to the Federal Constitution. We have Fourteenth not been pointed to any reason why the proceeding in this case is contrary to the Constitution, nor to any reason why it is not within the powers granted to Kansas City. The order sustaining the motions to dismiss was therefore erroneous. The judgment is reversed and the cause remanded. All concur, except *Walker, J.,* who dissents in separate opinion, in which *David E. Blair, J.,* concurs.

WALKER, J. (dissenting).—I do not agree with the arguments adduced or the conclusion reached in the majority opinion. A review of the facts and the relevant cases since the rehearing has but confirmed my conclu-

sion that the enactment and enforcement of ordinance No. 39946, will result in the confiscation of private property for purely aesthetic purposes. A brief statement of the facts can but aid in a clearer understanding of the matter at issue. A petition was filed in the Circuit Court of Jackson County, in the name of Kansas City (hereinafter designated as appellant), but in fact by certain property owners residing along Gladstone Boulevard in said city. Others owning property on said boulevard and in the adjacent territory defined as "the benefit district" who opposed the proceedings, were made defendants (hereinafter designated as respondents). The ordinance in question has subsequently been adopted by the legislative assembly of Kansas City. This suit, therefore, involves a discussion of the right of condemnation of private property thereunder. It is contended by the appellant that the powers of eminent domain and taxation are invoked. The first, in that it seeks to condemn private property for an alleged public use; and the second, that the damages or benefits to each of the lots within the benefit district are determined, distributed and charged against said lots and to owners within the defined district and against Kansas City ratably according to the measure of the estimated benefits or damages.

The burden of the petition is that the enforcement of the ordinance "will render it impossible to desecrate Gladstone Boulevard, the Concourse, the Colonnade, and the open Plaza, connected therewith, forming a part of the convergence of Benton Boulevard with Gladstone Boulevard and St. John Avenue by the erection thereon of gasoline filling stations, billboards and cheap commercialisms." The limitations in this plea are that none of the things sought to be prevented may be erected within two hundred feet of any residence and that such restrictions "be extended as far as may be necessary to protect the park development against all inappropriate and derogatory encroachments; and that the ordinance

may contain condemnatory provisions such as may be deemed expedient." To this end is added a plea, purely precatory, addressed to the receivers of the street railway company and managers of oil companies, to cooperate with the city "in maintaining and preserving this first typical parkway development in accordance with the high standard of the civic aspirations in which it was conceived and laid out." To this is added a request that the park board "carry forward and complete the development of the Concourse in accordance with the original plan therefor and thus add more strikingly to the beauty of the particular locality now under consideration and to the joy the public will receive therefrom."

Omitting purely argumentative matters expressed in language much akin to that employed in the petition, the ordinance recites, among other things, that the (1) buildings along the boulevard are used exclusively for residential purposes and that the sentiment of the property owners is that the enactment and enforcement of the ordinance would enhance and stabilize the value and utility of the property within the benefit district and add to the beautification of said highway and North Terrace Park; (2) that for twenty years hereafter no building or part thereof shall be constructed within thirty-five feet of the nearest sideline of said boulevard, nor shall any building within the benefit district be used within that period for any other than residential purposes, and that no bill boards or gasoline tanks with a capacity of over one hundred gallons shall be placed at any one locality, nor shall any gasoline filling station be erected or maintained within the benefit district during said period; (3) that the benefit district shall comprise all lands lying within one hundred and fifty feet of the respective side lines of Gladstone Boulevard from Independence Boulevard to Wheeling Avenue, and within one hundred fifty feet of St. John Avenue from Gladstone east, approximately four hundred feet; (4) that a con-

demnation proceeding should be begun forthwith and prosecuted to ascertain the damages and benefits in accordance with Article 13 of the charter of Kansas City; (5) that the damages shall be paid by special assessments upon the real property within the benefit district and just compensation assessed, collected and paid as provided in said Article 13; (6) defines the limits of the property deemed to be benefited within the benefit district; (7) provides for repeal within twenty years upon a petition of a majority of the owners of private property abutting upon the boulevard between the termini stated.

The motion filed by respondents in the circuit court to dismiss the proceeding is based upon the general ground that the charter of Kansas City does not provide for this proceeding or for the enactment of such an ordinance. The grounds of this motion are that (1) Gladstone Boulevard was established by an ordinance numbered 4972, which became effective April 7, 1893, long prior to the taking effect of the present charter of Kansas City in 1909; (2) that ordinance numbered 39946 was not recommended by the Board of Park Commissioners of Kansas City; (3) that the owners of a majority in front feet of land abutting on Gladstone Boulevard had not petitioned for the restrictions defined by said ordinance; (4) that the Board of Park Commissioners had failed to find that a majority in front feet of the lands fronting on said boulevard had petitioned for said restrictions as required by Article 13 of the charter; (5) that the Common Council had not found that the majority in front feet of the owners had petitioned for such restrictions as required by said article; (6) that the Board of Park Commissioners had not adopted a resolution establishing said restrictions, and that the ordinance failed to recite that such a resolution had been adopted by said board; (7) that upon the property affected by the ordinance there were many substantial and elegant residences which had been built for more than twenty years within twenty-five feet of the

nearest line of said boulevard, mostly within twenty feet thereof; that said ordinance applied only to buildings thereafter to be erected and was therefore unreasonable, oppressive and lacking in uniformity and violative of the charter of Kansas City, the Fourteenth Amendment of the Constitution of the United States, and Sections 4 and 20 of Article 2 and Clause 26 of Section 53 of Article 4 of the Constitution of Missouri; (8) that Kansas City has no lawful right to establish a building line upon the property of the respondents without their consent; (9) that there was no power under Article 13 of the charter authorizing the framing of restrictions for the exclusion of billboards, the sole authority therefor being under Article 6, Section 18, of the charter; (10) that much of the land in said benefit district did not abut upon any boulevard, parkway, road or avenue under the control or management of the park commissioners; (11) that no provision of the law of Missouri or of the charter of Kansas City conferred power upon the legislative assembly of said city to prevent the carrying on of a business over fifty feet from a boulevard of said city; that said ordinance undertook to exclude business within one hundred and fifty feet thereof; (12) that said ordinance was class legislation; (13) that it undertook to withdraw from the respondents valuable rights, and that no property in the so-called benefit district was unaffected by the proposed restrictions; that all of it suffered the same injury, was subjected to the same burden and was, therefore, damaged, but that all of the compensation therefor must come from the property thus injured and damaged; that no provision was made for the assessment of benefits against the city or against property not bearing such burden or suffering such loss; that thereby valuable property rights of respondents were confiscated and their property taken and damaged without due process of law, in violation of the Constitution of the United States and the State of Missouri (citing the sections and articles); (14) that said ordinance created no genuine benefit dis-

trict and did not provide for the assessment of benefits against the city at large; (15) that the proceeding was not to condemn property for parkway or boulevard purposes as authorized by Article 13 of the charter, and is not a permanent appropriation for public use; (16) that the benefit district was unreasonably small; (17) that the ordinance was beyond the city's power and contrary to the Constitution and laws of the State of Missouri in that it seeks to condemn valuable property rights, not for the use and possession of the public, but exclusively for aesthetic purposes, and is confiscatory in its nature, thereby violating the Constitution of the United States and of the State of Missouri (citing articles and sections); (18) that said ordinance constitutes an effort to take private property for private use without the consent of the owners; (19) that while in the form of proceedings in the exercise of eminent domain, it is an unlawful attempt to exercise the police power of the city to exclude from the benefit district all public buildings without compensation and in violation of the laws of the State; (20) that no assessment of benefits in said proceeding could have legal effect for the reasons aforesaid; (21) that the defendants, owners of property in said district to be charged with special benefits, object and protest against the imposition of such benefits for the reasons aforesaid. Wherefore, respondents prayed that the ordinance be declared void and the cause dismissed.

Respondent's motion to dismiss was sustained by the circuit court, from which ruling this appeal is perfected.

Article 13, Section 40, of the charter of Kansas City, cited in the foregoing motion, provides that upon a recommendation of the Board of Park Commissioners building restrictions may be established and fixed on any boulevard, parkway, road or avenue under the control and management of the park commissioners and may prohibit the carrying on of business vocations within fifty

feet of such boulevard, or to establish building lines, provided that no restrictions should be fixed unless the owners of a majority of front feet of the lands abutting on such boulevard or part thereof should petition therefor, stating clearly the restrictions desired, and the Board of Park Commissioners and the council should in their resolutions and ordinances find and declare that such majority had petitioned therefor, but such provisions should not apply to any boulevard, parkway or avenue established prior to the taking effect of "this charter" but only to such boulevards, parkways, roads or avenues thereafter established.

Section 41 of said Article 13 prescribes the manner in which restrictions established by ordinance may be removed upon the recommendation of the Board of Park Commissioners, which proceedings, so far as practicable, shall be the same as those required to establish such restrictions, but the manner provided shall apply only to the area covered by the original proceeding.

Section 18 of Article 6 of the charter defines the power of the Board of Park Commissioners in the prohibition of the erection of bill boards and other matters connected therewith.

While it is conceded by the city that the power to enact and enforce the ordinance numbered 39946 is not based upon or derived from either Section 18 of Article 6 or Sections 40 and 41 of Article 13 of the charter, a consideration of certain provisions of said sections becomes pertinent in the discussion of this case, which explain the setting forth of the material portions of same, notwithstanding the disclaimer of the appellants or reliance upon them for the enactment of ordinance 39946.

The attitude of the appellant in this regard in its own language is that: "This is an action in the nature of a condemnation proceeding founded upon an ordinance (No. 39946) which calls into play the sovereign powers both of eminent domain and of taxation. Eminent domain, in that Kansas City seeks to acquire, take

over and pay for certain property rights for public use, and the power of taxation, in that it seeks to have the amount of the damages allowed for the rights so acquired determined, distributed and charged against the several tracts of land, and the owners thereof within a defined benefit district and against Kansas City, ratably according to the measure that the benefits therefrom are enjoyed by each. The proceeding is novel only because of the character and scope of the proposed improvement, that is, of the nature of the rights sought to be acquired; otherwise than in the respect noted, well trodden and familiar paths of procedure are followed.''

I. Omitting the conclusion in said statement, the correctness of which we challenge, we will confine ourselves to the powers relied upon to sustain the enactment and enforcement of the ordinance and the results which of necessity must flow therefrom.

Private Use.

It is material, therefore, that we determine in the beginning exactly what is meant by the exercise of the power of eminent domain. A well-considered English case tells us that this phrase was not known to the common law, nor was the doctrine itself or any other application of it to be found except in the exercise of the sovereign of the perogative right to enter upon lands for the defense of the realm. [Attorney-General v. Tomline, 12 Ch. Div. 214.] The phrase is said to have been originated by Grotius in 1625, who says that ''the property of subjects is under the eminent domain of the State; so that the State, or he who acts for it, may use, and even alienate and destroy such property; not only in case of extreme necessity, but for ends of public utility, to which ends those who founded civil society must be supposed to have intended that private ends should give way.'' [De Jure Belli et Pacis, Lib. 3, c. 20.]

Couched in terms more applicable to present conditions, eminent domain may be defined as the right of the State or Nation, or those to whom the power has been

delegated, to condemn private property for public use and to appropriate the ownership and possession of same for such use upon the payment to the owner of due compensation to be determined according to law. Such is the nature of the power, evident from its very terms, that it is designated as eminent domain because it is superior to all private rights and is the exercise of the sovereign authority which of necessity resides in all governments for the common benefit and welfare of their citizens. [Twelfth Street Market Co. v. Philadelphia Ry. Co., 142 Pa. 580, 21 Atl. 989.]

It embraces, says the Civil Court of Appeals of Texas, "All cases whereby authority of the sovereign power and for the public good the property of the individual is taken without his consent." [Byrd Irr. Co. v. Smythe, 146 S. W. (Tex.) 1064.]

Our own court, following the trend of the foregoing and numerous decisions of like tenor in other jurisdictions, has more than once said that the right of eminent domain is a sovereign power to be used by the sovereign or by one on whom the sovereign has conferred it for a particular use; and when conferred, it is to be treated as an invasion of the rights of the individual whose property is to be taken and, therefore, strictly construed. [Chicago Ry. Co. v. McCooey, 273 Mo. 29, 200 S. W. 59; Light Co. v. Scheurich, 174 Mo. 241, 73 S. W. 496; Kansas City v. Marsh Oil Co., 140 Mo. 458, 41 S. W. 943.]

In Kansas City v. Oil Co., supra, GANTT, J., speaking for the court, in his usual terse style, says: "The right of eminent domain is inherent in every government. In this State it is not conferred, but is limited by the Constitution. The necessity and expediency of exercising the right are political or legislative in character; its enforcement, judicial. It is not pretended that this power is inherent in a municipality created by the State. It must be conferred by the State."

298 Mo.—39

It is further held in this opinion, about which there is no controversy here, that the right of eminent domain is conferred on such municipalities as Kansas City by Section 16 of Article 9 of the State Constitution, and that it may be exercised under such charter provisions as have been made therefor, subject to the limitations of the State Constitution. One of these clearly defined is that "whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and as such judicially determined, without regard to any legislative assertion that the use is public." [Sec. 20, art. 2, Mo. Const.]

Moreover, whatever power of the character here under consideration has been delegated to a municipality and called into existence by its charter, within the limitations stated, must, as we have said in Telephone & Telegraph Co. v. Railroad Co., 202 Mo. 656, 101 S. W. 576, be shown to have been bestowed in express terms or by necessary implication.

Before considering whether the power thus required to be made manifest exists, it is necessary to ascertain and determine whether in the exercise of eminent domain, contended for by the city, it has been shown that the purpose sought to be effected by the ordinance was a public one. While not conclusive, the ordinance should be so framed as to leave no doubt as to its character and, as a consequence, the purpose of its enactment. Under the constitutional provisions above quoted (Sec. 20, art. 2), a legislative assertion that the use is public will avail nothing if upon judicial inquiry such an use is found not to exist.

First, therefore, it is pertinent that the ordinance be permitted to speak in its own behalf; not that it may be found finally lacking from its own words, but that from these the moving impulse, which actuated the minds of its framers, may be ascertained. In Section 1 the purpose defined is to "enhance and stabilize the value

and utility of each and every piece of property within the benefit district herein prescribed and add to the beautification of said highway and the North Terrace Park.'' In this delineation of character it must be admitted that a lofty purpose is defined, full worthy of a Ruskin.'s mind; but wherein does there appear a syllable or a word which, either in express terms or by necessary implication, authorizes the conclusion that the purpose for which the property to be affected or taken is a public one. The mere declaration, therefore, without more, as to the enhancing and stabilizing of the values of property by moving back a building line and prohibiting oil filling stations, not declared or shown to be nuisances, does not comport with what the average mind, guided by pages of precedents, would construe to be a taking of private property for public use. Instead of such use is the purpose not clearly defined in the latter part of the section, viz.: ''to add to the beautification of said highway and the North Terrace Park.'' If for this purpose, then the action of the legislative department of Kansas City in enacting the ordinance was *ultra vires* and its effect nil. Certainly, it will not be gainsaid that Gladstone Boulevard was established for the use of the public and the cost of its establishment was charged as a special tax on the district affected. Under no reasonable construction of the language of the ordinance can it be said that all of the owners of property in the district will share proportionate burdens if the ordinance be enforced. While the State has delegated power to the city to condemn land for public use, this confers no power to condemn for private use. Public, as the term is used in the Constitution, means everybody; if the use is not for everybody, it is a private use. If to an individual or any number of individuals the right is given to use property in such a manner as will practically exclude the general public therefrom, it is the giving of the property to a private use and a destruction of its public service character. [Kansas City v. Hyde, 196 Mo. 498; Gaylord v. Sanitary Dist., 204 Ill. 576.]

Further proof of the correctness of the conclusion that the use to which the property to be affected is not public is found in the fact that the entire control and management of such property would remain as at present in its owners. The representatives of the public, viz., the park commissioners, are not authorized to exercise any supervision over the same. A public use as defined by a well recognized treatise "implies possession, occupation and enjoyment of the land by the public at large, or by public agencies." [Cooley, Con. Lim. (7 Ed.) p. 766.] The property, therefore, although subjected to a quasi-control by the city, would remain private property and the effect of the ordinance would simply be to limit in some instances the right of private enjoyment of one's own property for the benefit of other private individuals. The law does not lend countenance to this character of proceeding.

II. The ordinance is not a zoning ordinance, and the suggestion made that the affirmance of this case will obstruct zoning is irrelevant. Public benefit might accrue from a well conceived zoning ordinance, but great detriment from an evil one. An invalid ordinance would be as subject to objection under the caption of a "zoning ordinance" as an evil one.

*Zoning Regulation.*

A zoning ordinance will not make that a nuisance which is not one in fact. And the power of eminent domain cannot be exercised to destroy the enjoyment of private property, even if paid for, unless the public obtains the use of it for a public purpose. Furthermore, three things must concur to effectuate a valid condemnation: (1) The public must obtain possession (Pa. Mut. Ins. Co. v. Philadelphia, 242 Pa. 47, 88 Atl. 904, 49 L. R. A. (N. S.) 1062; Cooley on Const. Lim. (7 Ed.) p. 766; Gaylord v. Sanitary Dist., 204 Ill. 576, 63 L. R. A. 582, 98 Am. St. 235); (2) the use must be one of utility, not aesthetic, or for pleasure (Albright v. Park Coms., supra; Farist Steel Co. v. Bridgeport, supra; Woodstock v.

Gallup, supra); (3) compensation must be made, but it will not supply the absence of possession and public utility.

The reasons, therefore, why the proposed uses are not public are irrefutable, and are supported by a multitude of authorities. [Lewis on Em. Dom. (3 Ed.) pp. 506, 507, 508; Penn. Ins. Co. v. Philadelphia, 242 Pa. 47, 88 Atl. 904, 49 L. R. A. (N. S.) 1062; Albright v. Park Comr., 71 N. J. L. 303, 57 Atl. 398, 108 Am. St. 749, 69 L. R. A. 768; Farist Steel Co. v. Bridgeport, 60 Conn. 278, 292; Woodstock v. Gallup, 28 Vt. 587, 590; Gardner v. Newburgh, 2 Johns Ch. 162, 167, 7 Am. Dec. 526, 529; Gt. Falls Power Co. v. Railroad, 104 Va. 416, 52 S. E 172; In re Niagara Falls Ry. Co., 108 N. Y. 375, 15 N. E. 429; Hyde v. Kansas City, 196 Mo. 498; City of Richmond v. Carneal, 106 S. E. 403; Dillon on Mun. Corp. (5 Ed.) p. 1602; Ches. Stone Co. v. Moreland, 126 Ky. 656; Alfred Phosphate Co. v. Phosphate Co., 120 Tenn. 260, 113 S. W. 410, 412; Loan Assn. v. Topeka, 20 Wall. 665; Cole v. La Grange, 113 U. S. 1, 7, 8.]

III. The use to which the property sought to be affected not being a public one, this should be sufficient to determine the question at issue. If it does *Charter Authority.* not, however, it remains to be determined despite appellants' concession to the contrary whether the charter makes any provision authorizing this proceeding.

Section 40 of Article 13 of the charter provides as we have seen for the placing of restrictions upon property abutting on boulevards, but this provision is only held applicable to such as "may thereafter be established." A portion of Gladstone Boulevard was established by an ordinance, numbered 4972, approved April 7, 1893, and this charter provision did not take effect until 1908, or fifteen years after the establishment of the boulevard. The fact that a part of Gladstone Boulevard may have been established after the charter was adopted does not remove the foregoing objection to the validity of this proceeding, which includes and comprehends within its terms the

boulevard in its entirety as now existing. If, therefore, the building line and other restrictions sought to be established by this proceeding are free from the limitations of the charter for a portion of said boulevard and subject to them for the remainder, then it is evident, requiring no argument or the citation of any rule of construction to sustain the conclusion, that the ordinance cannot stand. To hold otherwise would be to lend approval to a judicial amendment of the ordinance which would recognize the application of the limitation of the charter to a part of the boulevard and ignore it as to the remainder.

Other than Section 40, Article 13 of the charter, no power is found therein for the placing of restrictions upon boulevards. Unless such power expressly appears or may be necessarily implied, as we have said in more than one instance, there is no authority for its exercise. [Chicago Ry. Co. v. McCooey, 273 Mo. 29; Telephone & Telegraph Co. v. Railroad, 202 Mo. 656.]

In St. Louis v. Dorr, 145 Mo. 1. c. 472, we said: "It is not pretended that there is any other specific authority by which the city of St. Louis is empowered to exclude such a business avocation as that of the defendants from property fronting on, or adjacent to, any public street. Without a clear grant of such power no municipal ordinance [of the sort invoked in this case] could possibly be sustained."

To a like effect was our ruling in St. Louis v. Kaime, 180 Mo. 1. c. 318: "When there are both special and general provisions, the power to pass by-laws under the special or express grant can only be exercised in the cases and to the extent, as respects those matters, allowed by the charter or incorporating act; and the power to pass by-laws under the general clause does not enlarge or annul the power conferred by the special provisions in relation to their various subject-matters. [1 Dill., Mun. Corp. (4 Ed.) pp. 392, 393.]

"This court in Ruschenberg v. Railroad, 161 Mo. 70, in treating of special and general provisions contained in an act or charter, through GANTT, J., said: 'When

there are two acts or charter provisions or ordinances, one of which is special and particular and certainly includes the matter in question, and the other general, and such that, if standing alone, it would include the same matter and thus conflict with the special act, the special act must be taken as intended to constitute an exception to the general act, and especially is this the law, when such general and special acts are contemporaneous.' ''

In addition, it is required by said Section 40, Article 13, that an ordinance of the charter of 39946 be approved by the Board of Park Commissioners. Not only was this not done, but so far as the record discloses, it was never submitted to the board; nor is there a finding by the board that a majority of the abutting owners had filed the petition for the ordinance; nor was such a finding made by the Common Council; nor was there a resolution by the park board establishing the restrictions. A compliance with these requirements of the charter constituted conditions precedent to the validity of the proceeding. That they were not complied with, the record affords ample evidence, which is supplemented by the affirmative admission of counsel for the appellant that no effort was made to comply with them. However, as stated, appellant disclaims reliance upon Section 40, Article 13, and Section 41, which follows and emphasizes the limitations of the former, and seeks authority for same upon the general power of the city to condemn private property for public use. There is no such general power conferred upon the city by charter or otherwise which would authorize the Common Council to exercise the power here sought to be invoked. While it is true that the power of eminent domain is inherent in the State, it exists in subordinate sovereignties only as the same has (as in Sec. 16 of Article 9 of our Constitution) been delegated by the State; and to determine the extent to which the powers thus delegated has been exercised we look to the charters of such sovereignties. Aside from Section 40 and a further Section 18 of Article 6 of the charter of Kansas City concerning bill boards, to which

ordinance 39946 does not conform, we find no general organic provision in the laws of said city authorizing the proceedings here sought to be inaugurated and conducted. In addition if, as we have indicated in the foregoing discussion, the power of eminent domain inheres in the State and can only be exercised by a municipality therein as delegated to it by the State, such power is purely derivative and as such finds no resting place to sustain its exercise in the common law, but must seek its origin in the Constitution of the State; and the extent to which it may be exercised must be set forth in the charter adopted by the municipality in conformity with the Constitution. Absent therefrom such power does not exist.

IV. Although relying upon the doctrine of eminent domain to sustain its action herein, it is somewhat vaguely contended that the ordinance in question may be upheld under the exercise of the police power.

Police Regulation.

This power like the mantle of the Persian monarch, may, upon a cursory consideration of same, be held to be capable of indefinite extension; but an analysis of the facts in a given case illustrative of its exercise will demonstrate that to be upheld cogent reasons must be found for the invoking of same.

So far as the public is concerned, the exercise of the police power of eminent domain usually has the same foundation, viz., a consideration of the public good. To illustrate, under the doctrine of eminent domain the State may take and acquire property deemed necessary for the public good; under the police power it may prohibit the use of such property as is not for the public good. It will be seen, therefore, as stated by the respondents that when the taking assumes the form of a prohibitory easement, as at bar, the field of operation of the two powers becomes coincident. In short, if a certain use of property may not be prohibited for the public good by the exercise of the police power, it may not be prohibited for the public good by the exercise of the power of eminent domain. A learned treatise on this subject, which derives its inspiration from many sources, thus discusses

these two powers: "From one point of view there is a considerable resemblance between the police power and the power of eminent domain in that each power recognizes the superior right of the community against the selfishness of individuals. . . . In the exercise of eminent domain property or an easement therein is taken from the owner and applied to public use, because the use or enjoyment of such property or easement therein is beneficial to the public; in the exercise of the police power the owner is denied the unrestricted use or enjoyment of his property, or his property is taken from him, because his use or enjoyment of such property is injurious to the public welfare." [1 Nichols, Em. Dom. (2 Ed.) pp. 53, 54.]

In an illuminative opinion by this court in St. Louis v. Dreisoerner, 243 Mo. l. c. 223, the exercise of the police power by a city was thus defined: "The police power is a necessary and wholesome faculty of municipal government, but it only extends to the regulation of employments prejudicial to the public safety, health, morals and good government of the citizenry, and it 'ends where those public interests are not beneficially served thereby.' [Gunning v. St. Louis, 235 Mo. l. c. 147.] It cannot sanction the confiscation of private property for aesthetic purposes." In that case as in the one at bar it was not shown that the power sought to be exercised was for the public good in that the requirements sought to be imposed or the restrictions attempted to be created were prejudicial to the public safety, health or morals of the citizens. The court held, therefore, as we hold here, that the ordinance was bad and could not be upheld.

V. An analysis of the cases cited in the majority opinion does not sustain the conclusion reached therein. A synopsis of same demonstrates the correctness of this statement as follows:

**Unreasonable Restriction.**

We are not here dealing with an admittedly valuable and subsisting easement as presented in State ex rel. Meadow Park Land Co. v. Buckner, 288 Mo. 618; nor

solely with bill boards, which may be considered nuisances *per se,* as in St. Louis Gunning Co. v. St. Louis, 235 Mo. 99, and St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269; nor with the fact that in some instances and for the public good private rights may become subservient to the public welfare, as announced in State ex inf. v. Merchants Exchange, 269 Mo. 346, 356; nor with Housing acts rendered necessary by war conditions to enable the Federal Government to function, as in Block v. Hirsch, 256 U. S. 135; nor with the limitations of the height of buildings in order to increase public safety, as in Welch v. Swasey, 214 U. S. 91, and Attorney-General v. Williams, 174 Mass. 476; nor with a general zoning scheme authorized by special constitutional provisions, as in Opinion of the Justices, 234 Mass. 597; nor with the mere exclusion of a gasoline filling station from a dangerous location, as in Des Moines v. Manhattan Oil Co., 184 N. W. (Iowa) 823; nor with a constitution which did not make a public use *vel non* an exclusively judicial question, as in State ex rel. v. Houghton, 144 Minn. 1; nor with the condemnation of land, as in Bunyon v. Commissioners, 167 App. Div. (N. Y.) 457, and United States v. Gettysburg Ry., 160 U. S. 668. But we are dealing with an attempt under the guise of the public welfare and ostensibly for the public use to prohibit landowners from building any kind of structure within thirty-five feet of Gladstone Boulevard, or building, leasing or using any structure within one hundred and fifty feet of said boulevard for other than residential purposes, regardless of size, beauty, utility or desirability. "This," as succinctly said by counsel for respondents, "is unreasonable, excessive and an unwarrantable interference with the rights of private property and a deprivation of the gains of one's industry."

In consideration of all of which, the judgment of the trial court should be affirmed. *David E. Blair, J.,* concurs.