The **CURATORS OF the UNIVERSITY OF MISSOURI, Respondent,**

v.

Arthur **BROWN, et al., Appellants.**

No. WD 43426.

Missouri Court of Appeals, Western District.

March 19, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 1991.

Application to Transfer Denied June 11, 1991.

Irving Achtenberg, Achtenberg & Achtenberg, Kansas City, for appellants.

Larry L. McMullen, Peter T. Niosi, and David B. Raymond, Blackwell, Sanders, Matheny, Weary & Lombardi, for respondent.

Before BERREY, P.J., and TURNAGE and GAITAN, JJ.

TURNAGE, Judge.

The Curators of the University of Missouri brought this action in condemnation to acquire property owned by Arthur Brown. Brown challenged the right of the Curators to acquire his property by alleging that the taking was for a private use and not a public use. The court found the taking was for a public use. A trial fixed the value of Brown's property and Brown appeals on the sole ground that his property is being taken for private use in violation of Art. I, § 28 of the Missouri Constitution. Affirmed.

Dr. E. Grey Dimond is recognized as the founder of the Medical School at the University of Missouri at Kansas City. For some years Dr. Dimond served as provost of Health Sciences at UMKC and is presently provost emeritus and a professor of medicine. Dr. Dimond and his wife, Mary, acquired property just south of the Medical School on which they built their residence. Several years ago Dr. Dimond decided to devote his property to the use of a Scholars' Center for the University. To accomplish this Dr. Dimond conveyed much of his property to a not-for-profit corporation, Diastole–Hospital Hill, Inc. Thereafter, a series of agreements were entered into between Dr. Dimond, Diastole, the Trustees of the University of Kansas City, and the Curators.[1] It is not necessary to detail these agreements but the substance was that Dr. Dimond conveyed certain of his property to Diastole reserving the right to live in his home as long as he lives. Dr. Dimond made a gift to the Trustees of the University of Kansas City of securities worth over $300,000 which will have a value of about one million on their maturity in 2000 for the purpose of endowing the operation of the Scholars' Center. An agreement between the Curators, Dr. Dimond, Diastole and the University of Kansas City reflected that the Curators had agreed to the establishment of a Scholars' Center in accordance with Dr. Dimond's plans and that it was necessary for the development of the Center that the Curators acquire the Brown property for parking to serve the Center.

Chancellor Russell of UMKC stated that Scholars' Centers are common at universities and most are privately funded. He stated the University is enthusiastic about the establishment of the Center. He explained that the Center will be on the Hospital Hill Campus which is some distance from the Volker Campus. The Hospital Hill Campus includes the Medical and Dental Schools and the future location of the Pharmacy School. Also included at this location are Truman Medical Center and Children's Mercy Hospital, the teaching hospitals for the medical school. Russell stated parking is very limited at the Hospital Hill Campus and if the Scholars' Center should ever cease to operate, the land in question here would be used for other university parking.

Brown urges several grounds for reversal of the trial court's finding that the Curators sought his land for a public use, but all of these arguments boil down to the single argument that because the Scholars' Center is located on land which is not owned by the Curators its acquisition is for the private purpose of Diastole, or Dr. Dimond. Brown relies upon a number of cases which hold that a public entity may not acquire property for use by a private entity through the use of the power of condemnation. No fault can be found with those cases but they are simply inapplicable to the facts of this case.

Section 172.020, RSMo 1986, gives the Curators the power to condemn real estate for any public purpose within the scope of its organization. In *State v. Neill*, 397 S.W.2d 666, 670 (Mo. banc 1966), the court held:

It is the clear intent of the Constitution and statutes to confer on the Curators the authority to select sites on which to carry out the functions of the University and to acquire real estate for such purposes by purchase or condemnation. It is also clear that the Curators are authorized to construct improvements on the real estate constituting the site of a University function.

\* \* \* \* \* \*

It is too late in the motor age to contend successfully that parking facilities are not a necessary adjunct of the proper use of improved real estate.

From *Neill*, it is clear that the Curators have power to acquire land by condemnation for the purpose of providing parking facilities for University use. The argu-

---

1. The University of Kansas City was a private operating University prior to 1963 when it conveyed all of its property to the Curators so that the Curators could operate the University of Missouri at Kansas City as a part of the University of Missouri system. The University of Kansas City continues to exist for the sole purpose of supporting the University of Missouri at Kansas City. The Trustees of the University of Kansas City acquire property and raise funds for UMKC.

ment here that because the Scholars' Center is on land owned by others than the Curators that this transforms the Scholars' Center into a private use is erroneous. The Scholars' Center is designed solely for use for University purposes to provide a supporting facility to the various schools of the University of Missouri at Kansas City. It is to be used only as a meeting place for persons and groups devoted to promoting and maintaining the success of the various schools at UMKC and as a catalyst to bring to the Hospital Hill Campus opportunities for furthering national and international exchange, and social intercourse in all reaches of scholarly endeavors. The Curators approved the establishment of the Scholars' Center to support the University knowing that the Center was actually located on land not owned by it. However, the various agreements provide that the Center shall retain its use in conjunction with the University to prevent the Center from becoming a strictly private enterprise. Thus, there is assurance that the Center will operate as a part of the University. In addition, Dr. Dimond has made generous gifts to assure the construction and operation of the Center. These gifts have been made with provisions that the funding and management of Diastole cannot be changed. Thus, the Center is established, endowed and structured so that it will retain its purpose as a Scholars' Center for the benefit of UMKC.[2]

The Brown property will become the property of the Curators and will remain the property of the Curators. There is no agreement or plan on the part of the Curators to transfer the Brown land to any other entity. Further, the agreements provide that the Brown property shall be used in connection with the Center or such future use in connection with UMKC as may be determined by the Curators.

The agreements do provide that Diastole will donate sufficient funds to the Curators

to cover the costs and expenses incurred by the Curators in the acquisition of the Brown property and to cover all expenses. Diastole further agrees that it would pay the expenses of improving, maintaining, and operation of the Brown property to be used in conjunction with the Scholars' Center. Brown contends that because the costs and expenses of acquiring the property are to be paid by Diastole that this further indicates a private, rather than a public, use of the property. In *Arata v. Monsanto Chemical Co.*, 351 S.W.2d 717, 721[3] (Mo.1961), the court stated that:

[I]t is settled that the mere fact that certain individuals or interests who are specially benefited[sic] by a proposed improvement contribute to the cost thereof does not show that the improvement is for a private purpose or render it any the less public within the meaning and scope of the law of eminent domain.

Thus, the fact that Diastole contributes the money to cover the costs of acquiring the property does not convert the public use to a private use.

It is further stated in *Arata:*

Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character. Quoting from *Kansas City v. Liebi,* 298 Mo. 569, 593, 252 S.W. 404, 408 [1923].

*Id.* at 721.

Although the Scholars' Center is located on land not owned by the Curators, it is devoted to a use to further the mission of the University of Missouri at Kansas City.[3] The continued use of the Center for use by the University is insured by agreements and the organizational structure of Diastole. The use of the Center for public educational use is insured just as is the use of facilities located on land owned by the

**2.** Dr. Dimond stated the reason he gave the land to Diastole and the endowment to the University of Kansas City was to insure that the Center would be operated only for the benefit of UMKC. He feared that if the land and endowment were given to the Curators that it would be possible for the Center to lose its distinctive Kansas City purpose because the Curators are

responsible for the operation of Campuses at Columbia, Rolla and St. Louis in addition to Kansas City.

**3.** The Curators seek leave to file a 1990 schedule showing usage of the Center. Brown objects to the schedule being filed. The objection is sus-

Curators. The Curators have the power to condemn land to provide parking for its educational facilities and the Brown land is to be used for parking in conjunction with the Scholars' Center which is devoted to University purposes. The fact that parking spaces for the Scholars' Center may benefit Diastole does not convert the use which the Curators propose to make of the Brown property into private use under the facts present here.

Brown makes some argument that other land is available for parking and that this land is not necessary. It is also held in *Arata* that there is a distinction between public use and public necessity. The question of public use is a judicial one while the issue of public necessity is a political question to be decided by the entity exercising the power of condemnation. *Id.* at 721. The question of public use has been decided and the question of necessity was decided by the body charged with making that decision—the Curators.

The judgment is affirmed.

All concur.